**PHOENIX RACING, LTD. and Wraith Automobile Racing, Inc., Plaintiffs,**

v.

**LEBANON VALLEY AUTO RACING CORPORATION, Howard Commander, and Shaker Flats Corporation, Defendants.**

**No. 97–CV–0493 LEK/DRH.**

United States District Court, N.D. New York.

June 30, 1999.

Wadland & Associates, Boston, MA (Joseph J. Wadland, of counsel), for plaintiffs.

Cohen, Pontani, Lieberman & Pavane, New York City (Stephen L. Cohen, of counsel), for defendants.

## DECISION AND ORDER

KAHN, District Judge.

This diversity action, brought by Plaintiffs Phoenix Racing Ltd. ("Phoenix Racing") and Wraith Automobile Racing, Inc. ("Wraith"), arises out of an agreement in which Plaintiffs agreed to lease an automobile racing facility owned by the Defendants. Plaintiffs now allege that Defendants induced them to enter the lease by misrepresenting the facility's suitability for improvement and expansion and that Defendants have breached the lease in numerous respects regarding performance. Defendants counter that Plaintiffs have breached the lease by failing to pay rent and Plaintiffs' share of real estate taxes and overhead costs.

In their amended complaint, Plaintiffs allege claims for breach of contract, breach of the covenant of good faith and fair dealing, unjust enrichment and promissory estoppel. Defendants Lebanon Valley Auto Racing Corporation ("Lebanon Valley") and Shaker Flats Corporation ("Shaker Flats") have answered and filed three counterclaims: breach of contract, unjust enrichment and a request for a declaratory judgment.[1] Presently pending

is a motion by Defendants Lebanon Valley and Shaker Flats for (1) summary judgment on part of Plaintiffs' first and second claims and on Plaintiffs' third and fourth claims in their entirety and (2) summary judgment on Defendants' counterclaims. Also pending is Plaintiffs' cross-motion to file a second amended complaint adding a claim for fraudulent inducement to contract. For the reasons discussed below, Plaintiffs' cross-motion to amend is denied, Defendants' motion for partial summary judgment on Plaintiffs' claims is granted-in-part and denied-in-part and Defendants' motion for summary judgment on their counterclaims is granted-in-part and denied-in-part.

## I. Background

In the context of Defendants' motion for summary judgment, the facts are viewed in the light most favorable to the Plaintiffs as non-movants. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

This action arises out of an agreement in which Plaintiffs leased certain tangible and intangible property associated with a racing car drag strip located at the Lebanon Valley Speedway ("the Speedway"). The Speedway is a auto racing operation in West Lebanon, New York, which includes, among other things, a drag strip (the "Dragway") and a circle-track (the "Circle-Track").[2] The Speedway is owned by Defendants Lebanon Valley and Shaker Flats, both of which are New York corporations of which Howard Commander ("Commander") is the president and sole

---

1. Defendant Howard Commander does not appear to have filed an answer, nor is he a party to the motions currently before this Court.

2. In deposition, Howard Commander referred to the "Speedway" as a synonym for the Circle-Track specifically. *See* Mullen Aff.Ex.

I, Vol. I at 20–21. However, in their motion papers, the parties consistently refer to the entire property, encompassing both the Dragway and the Circle-Track, as the Speedway. *See, e.g.*, Def. Stmt. Undisp. Facts. ¶ 12. Therefore, this Court adopts the latter terminology in this opinion.

or principle shareholder.[3]

Plaintiffs Phoenix Racing and Wraith are affiliated companies in the business of promoting and operating automobile racing events. Previously, Vincent Barletta ("Barletta") was the president and sole owner of both companies. Mullen AffEx. F, ¶ 1. Since the time of Barletta's death in January of 1998, the stock in Wraith has been held by Barletta's estate and Timothy Barletta, Barletta's son, is currently the owner of Phoenix Racing and the president of both companies.

Around March 12, 1994, Phoenix Racing entered into a written agreement (hereinafter "the Agreement") with Lebanon Valley and Commander to lease for eighteen years all tangible and intangible property used in conjunction with the Dragway. This property included, *inter alia*, real estate on which the Dragway was located, certain abutting real estate, physical assets used by the existing Dragway and the permits held by Commander to run the Dragway. The Agreement refers to all of this property together as the "Dragway Facility."[4]

Plaintiffs' purpose in entering into the Agreement was to develop and improve the Dragway Facility into a National Hot Rod Association ("NHRA") sanctioned drag racing facility in order to obtain NHRA approval to host national NHRA drag racing events. For several years prior to 1994, Barletta and an associate, Joseph Henry ("Henry"), had been looking for a site in Massachusetts where they could develop a drag racing facility capable of hosting such national NHRA-sponsored events. They had frequently met opposition either from the board controlling the usage of the property or else from local property owners. Their last attempt in Massachusetts involved a property in Warrensburg. Although successful in obtaining a special use permit from the town board, they were halted in their development efforts when abutting property owners appealed the grant.

At sometime in 1993, their efforts to build a drag strip in Massachusetts came to Commander's attention. Around December of 1993, he directed an employee named Donald Kline ("Kline"), at that time working as manager of the Dragway, to contact Henry.[5] *See* Mullen Aff.Ex. Ex. J at 55–56. After being contacted by phone, Henry indicated an interest in making use of the Speedway. Henry subsequently spoke by phone with Commander on December 31, 1993. Mullen Aff.Ex. K, Vol I. at 37, 211. Commander proposed that Henry and Barletta consider making use of the Dragway. Henry stated that they "were only interested in looking at property that will host a national event. . . ." *Id.* at 38. After an extended discussion about the Dragway, Commander suggested that the parties meet to talk further. The parties had several subsequent meetings, the first of which was attended by Command-

---

**3.** Shaker Flats was previously referred to as the Lebanon Valley Auto Racing Corporation. Around the mid–1980s, the corporation's name was changed to Shaker Flats, and around the same period, a new corporation named Lebanon Valley Auto Racing Corporation, the Defendant in the instant case, was created.

**4.** The introduction of the Agreement defines the Dragway Facility as "all of the permits, improvements, trade name, goodwill and real estate assets used by Lebanon Valley in conjunction with the operation" of the Lebanon Valley Dragway. Mullen Aff.Ex. A at 1. Section 2.0 of the Agreement states in part that "Phoenix agrees to lease . . . the existing Dragway Facility . . . such lease to include all property, tangible and intangible, real and personal, used in conjunction with the operation of the Dragway Facility, including usage of the residence and other land owned or controlled by Howard Commander abutting and across the street from the Dragway Facility." Mullen Aff.Ex. A at 2, § 2.0.

**5.** At Kline's deposition, he stated that he had independently learned of the efforts of Barletta and Henry to develop a dragway in Massachusetts. *See* Mullen Aff.Ex. J at 53. However, he also made it clear that his initial contact with Henry was at Commander's request.

er, Barletta, Henry and Kline. *See* Mullen Aff.Ex. J at 59.

Both in his initial phone conversations and at the subsequent meetings, Commander made a number of representations regarding the Dragway and its suitability for further development. He represented that although the Dragway used only 150 acres, the surrounding property in his ownership consisted of 600 acres, and that Plaintiffs could "just start paving it over" or doing "anything [they] wanted." Mullen Aff.Ex. K, Vol. I at 214. At the first meeting, he represented that the "recreational commercial zone can expand to use a total of 600 acres." *Id.* This would suggest that Commander was not claiming that the zone currently encompassed 600 acres. However, Henry has also stated in deposition that Commander told them at the first meeting that they "*had access* to commercial recreational facility of six hundred acres." *Id.* at 202 (emphasis added). Further, during their December 31 conversation, Commander allegedly stated that the 600 acres was already zoned for recreational commercial use. *See* Mullen Aff. Ex. K, Vol. I at 59 ("Howard was explaining that he had 600 acres that was under recreational zoning"); *see also* Mullen Aff. Ex. K, Vol. I at 74–75.

Concerning the need for town board approval of further development, Commander represented that "any permit needed to expand could be obtained from the town," Mullen Aff.Ex. I, Vol. II at 23–24, and indicated that obtaining such permits would be no problem because "the board members were in his pocket by a majority." Mullen Aff.Ex. K, Vol. I at 217. Regarding the possibility of opposition from local landowners, Commander allegedly stated: "[Y]ou are not going to have to deal with what you have been doing in the past, with these other groups that are trying to stop you. We have been here,

we are running, that is not going to be an issue." Mullen Aff.Ex. K, Vol. II at 25.[6]

Relying on these representations, Barletta acting on behalf of Phoenix Racing entered into the Agreement on or around March 12, 1994. Under the terms of the Agreement, Phoenix Racing leased the Dragway Facility for a period of 18 years, while Lebanon Valley retained the right to use the Circle–Track. Among many additional terms of the Agreement, Phoenix Racing agreed to pay for the capital costs of improving the facility, and would have the rights to income generated by the Dragway Facility and all sponsorship income except for certain existing sponsorship contracts. Lebanon Valley retained the exclusive right to run food and beverage concessions at the Dragway, although the parties agreed to split profits above $150,000. Pursuant to paragraph 2.0 of the Agreement, Phoenix Racing designated Wraith as the operating company which would operate the business of the Dragway Facility. Mullen Aff.Ex. F, ¶ 4. After the signing of the Agreement, Plaintiffs began efforts to develop the Dragway Facility, ultimately expending more than $3,000,000 on improvements. Mullen Aff. Ex. F at ¶ 18.

However, in the process, Plaintiffs also discovered a number of impediments to the development of the Dragway Facility. Two of these related to land on the north side of the Kinderhook Creek, the side opposite to that on which the Dragway was located. Plaintiffs intended to use this north land as an expanded pit area, where racing cars would be parked. However, they discovered that the land was zoned for residential use only. They also learned that there was a fishing easement all along the Kinderhook Creek which prevented them from building a bridge across it as necessary to make the north land accessible from the Dragway.[7]

---

6. The precise context of Commander's statement is unclear from the record.

7. Defendants assert that the minutes of an alleged April 7, 1994 meeting before the Zoning Board of Appeals for the Town of New Lebanon indicate that Barletta was aware at that time of all of the alleged land problems.

Plaintiffs ran into additional difficulty from a local opposition group named the Concerned Residents of New Lebanon ("CRONL"). Around the summer or early fall of 1995, this group initiated a lawsuit claiming that both the Circle–Track and the Dragway, even in their current state, were public nuisances. Mullen Aff.Ex. I, Vol. III at 40. As of April 2, 1998, this litigation was ongoing. *Id.* at 42. The litigation and CRONL's direct pressure on the Town Board significantly increased the difficulty in upgrading the Dragway Facility and at some point in 1996, Plaintiffs ended their attempts to do.

Since 1996, the relationship between Plaintiffs and Defendants has largely collapsed into acrimony. Plaintiffs have continued to run races at the Dragway. However, Defendants allege that Plaintiffs have not paid the rent, property taxes or overhead charges (specifically, charges for electricity) which they owe under the Agreement. Plaintiffs in turn allege that Defendants have breached the Agreement in numerous ways respecting their obligations of performance. Among other alleged breaches of the Agreement, Plaintiffs allege that Defendants have interfered with Plaintiffs' use and enjoyment of the property (including cutting off electrical power to the Dragway scoreboard during racing events),[8] that Defendants have refused to allow Plaintiffs to investigate the business and operations of Lebanon Valley, that Defendants have refused to operate concession stands in the manner requested by Plaintiffs, that Defendants have understated concession income, that Defendants' lease of certain portions of the Dragway Facility to a third party for use as an asphalt plant and current attempts to re-lease the plant to a new operator have prevented Plaintiffs from using that land, and that Defendants have withheld income from spon-

sorships owned to Plaintiffs under the Agreement.

After the commencement of this action, Defendants delivered a letter dated May 5, 1997 to Phoenix Racing stating that it was in default of its obligations under the Agreement based on its failure to pay rent, electric charges and taxes. Under the terms of the Agreement, Plaintiffs then had a 30–day period to cure the default, at the end of which Defendants would be entitled to terminate the lease and retain possession of all property improvements. Mullen Aff.Ex. A at 5, ¶ 3.9. On June 24, 1997, Plaintiffs filed a motion for an injunction tolling the running of the cure period pending resolution of this action (referred to as a *"Yellowstone* injunction" after the case *First Nat'l Stores v. Yellowstone Shopping Ctr., Inc.,* 21 N.Y.2d 630, 290 N.Y.S.2d 721, 237 N.E.2d 868 (N.Y. 1968)). Commander also filed a motion, seeking dismissal of the complaint against him on the grounds that he had not signed the Agreement in his individual capacity and thus could not be individually sued under it.

By Memorandum–Decision and Order filed August 19, 1998, this Court granted Plaintiffs' motion for a *Yellowstone* injunction but required Plaintiffs to pay all rent due including rent in arrears. *See* Dkt. No. 76, Memorandum–Decision and Order at 7, 12. This Court also denied Commander's motion to dismiss.[9] The pending motions were filed shortly thereafter. On April 19, 1999, this Court held a conference at which the parties consented to the trial of this action before the Honorable David R. Homer, Magistrate Judge, pursuant to 28 U.S.C. § 636(c)(1). However, this Court retained jurisdiction over the pending motions.

---

However, Defendants did not include the minutes of that meeting in the record.

**8.** *See* Mullen Aff.Ex. F at ¶ 11 (listing alleged interferences).

**9.** Commander has not filed an answer since the denial of his motion to dismiss or otherwise appeared in this action.

## II. Discussion[10]

### A. Plaintiffs' Cross–Motion to Amend

Plaintiffs have cross-moved to amend the Amended Complaint to add a claim for fraudulent inducement. Fed.R.Civ.P. 15(a) provides that leave to amend a pleading "shall be freely given when justice so requires." However, "it is within the sound discretion of the court whether to grant leave to amend." *John Hancock Mutual Life Insurance Co. v. Amerford Int'l Corp.*, 22 F.3d 458, 462 (2d Cir.1994). Denial is appropriate where there is "undue delay, bad faith or dilatory motive . . ., repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance of the amendment, [or] futility of amendment." *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *accord Hemphill v. Schott*, 141 F.3d 412, 420 (2d Cir.1998).

While "[m]ere delay . . . does not provide a basis for a district court to deny the right to amend," *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir.1993), a court may properly deny a motion for leave to amend "where the motion is made after an inordinate delay, no satisfactory explanation is offered for the delay, and the amendment would prejudice the defendant." *Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 72 (2d Cir.1990). The burden is on the movant to provide a satisfactory explanation for their delay and the court is free to conclude that ignorance of the law is no excuse. *Id.*

In this case, the record demonstrates that Plaintiffs have delayed for a substantial period of time. The procedural history is undisputed. Plaintiffs filed their original complaint on April 9, 1997. After obtaining permission from the Court, Plaintiffs filed an Amended Complaint on October 6, 1997. Pursuant to the Uniform Pretrial Order issued by Magistrate Judge Homer, *see* Dkt. No. 23, the deadline for filing further requests to amend the pleadings was set at December 1, 1997. *Id.* at ¶ 5. The deadline for completion of discovery was ultimately set at June 1, 1998. *See* Dkt. No. 58. Defendants served Plaintiffs with their dispositive motion on June 17, 1998. Plaintiffs served, with their opposition papers, a cross-motion to amend on or about July 23, 1998, fifteen months after filing their complaint, more than seven months after the deadline for motions to amend had passed,[11] almost two months after the close of discovery and more than one month after Defendants had served the Plaintiffs with their motion for summary judgment. Such a delay, absent a

---

10. As an initial matter, this Court takes note that Defendants' motion package was filed after the deadline set for filing dispositive motions. By Order of the Magistrate Judge filed March 31, 1998, the deadline for filing dispositive motions was extended to August 1, 1998. Defendants' motion package was not filed until September 8, 1998. However, a review of the papers indicates that Defendants were not wholly to blame for this circumstance. Defendants' motion papers were served on June 17, 1998 by overnight mail. Plaintiffs, who under the Local Rules had twenty-one days to serve opposition papers, *see* N.D.N.Y.L.R. 7.1(b)(1)(B) (pre–1999 version), served on Defendants papers in opposition and in support of their cross-motion which are dated July 23, 1998, thirty-six days later. When the papers were actually served is not clear. Further, after Defendants served a reply to these papers on or about August 13, 1998, Plaintiffs served a further response to Defendants' reply on August 27, 1998, although no such sur-reply was allowed under the Local Rules, even in cases where a cross-motion is made. *See* N.D.N.Y.L.R. 7.1(b)(1)(B), 7.1(d) (pre–1999 version).

Neither party has made any objection over the procedural errors of the opposing party. Accordingly, the Court will ignore these errors and address the respective motions of the parties on their merits.

11. The Second Circuit has suggested in dicta that a court should not reject such a motion merely because it is filed after the relevant deadline established in the court's scheduling order. *See Dluhos v. Floating and Abandoned Vessel, Known as "New York"*, 162 F.3d 63, 69 (2d Cir.1998). However, the failure to file a motion to amend by that deadline must, absent an excuse, at least constitute a per se case of undue delay.

valid excuse, is clearly inordinate. *See Cresswell*, 922 F.2d at 72 (finding no abuse of discretion where leave was denied for motion to amend filed more than 17 months after bringing suit, more than six months after filing first amended complaint, and more than one month after filing of motion for summary judgment, and where only explanation for delay was ignorance of law.).

Plaintiffs argue that the delay is excusable because they only discovered the facts supporting an element of their claim for fraudulent inducement around April of 1998. The elements of fraud include "(1) false representation(s) of (2) material fact with (3) intent to defraud thereby [scienter] and (4) reasonable reliance on the representation (5) causing damage to plaintiff." *Foxley v. Sotheby's Inc.*, 893 F.Supp. 1224, 1228 (S.D.N.Y.1995) (alterations in original). Plaintiffs assert that they only recently uncovered evidence which would support a pleading of scienter. Specifically, they point to Kline's deposition, which took place on April 24, 1998, at which the following exchange took place:

Q: Did Mr. Commander tell you whether he was concerned that he didn't want to have a competing dragway in Massachusetts?

. . . . .

A: Yes.

Q: What did you discuss about that issue, Mr. Kline, with Mr. Commander?

A: That we didn't need a drag strip right next door but we didn't know where Warren, Massachusetts, was.

Mullen Aff. Ex. J at 57. Plaintiffs assert that Kline's testimony reveals that Commander sought to persuade Plaintiffs into entering the lease in order to avoid having them as proximate competitors. Plaintiffs assert that this is evidence of motive for fraud, and that motive may be used to support an assertion of scienter.

It is true that evidence of motive to commit fraud may play an important role in pleading a valid claim for fraudulent inducement. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994). To make out a valid fraud claim, a plaintiff may allege fraudulent intent generally, *see* Fed.R.Civ.P. 9(b), but must still allege facts raising a "strong inference of fraudulent intent." Shields, 25 F.3d at 1128. That inference may be raised "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Id.*

Facts demonstrating motive must show "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosure alleged." *Id.* The avoidance of competition might be considered a concrete benefit which resulted from inducing Plaintiffs to enter into the Agreement. However, as the alleged result of the fraud was to induce Plaintiffs to enter the Agreement, any of the concrete benefits of the Agreement would by the same reasoning have provided some evidence of motivation. For example, Plaintiffs could as easily have relied on the fact that under the Agreement, the property owned by Defendants would be enhanced in value at Plaintiffs' expense. Indeed, Plaintiffs themselves assert that Commander's alleged fraud was partly motivated by the prospect of receiving Barletta's capital investments. *See* Pl. Reply at 6. It is clear that Plaintiffs were aware from the beginning of the action that this benefit attached to the formation of the Agreement. Thus, the discovery of an additional motivation later on does not provide a reasonable basis for delaying the assertion of fraud.

Moreover, the record belies an assertion that Plaintiffs had even a subjective belief that there was insufficient evidence prior to July 23, 1998 to support a fraud claim. In fact, Plaintiffs asserted fraud on No-

vember 5, 1997, as a defense to Defendants' counterclaims. *See* Pl. Reply to Counterclaims at 8. In doing so, Plaintiffs relied upon the allegations in their original complaint. Thus, they clearly considered their original allegations sufficient to support an assertion of fraud.

The timing of Plaintiffs' cross-motion to amend also suggests that the cross-motion was not prompted by Kline's testimony. Plaintiffs did not file their motion to amend promptly after hearing Kline's testimony. Rather, they waited for over two months until after Defendants had served Plaintiffs with motion papers to initiate their cross-motion. The timing of the cross-motion and the earlier allegation of fraud demonstrate that Plaintiffs' cross-motion was not prompted by newly discovered evidence.

The record is more consistent with the conclusion that Plaintiffs filed their cross-motion to amend in response to a belated conclusion that the added claim was necessary to support their existing unjust enrichment claim. Plaintiffs stated in their Memorandum In Opposition To Def. Motion For Summary Judgment ("Pl.Mem. Opp.") that "[o]rdinarily, unjust enrichment is a quasi-contractual claim not available where an express contract exists." Pl.Mem.Opp. at 16. They noted, however, that "Plaintiffs' proposed fifth cause of action for fraudulent inducement would have the effect of vitiating the contract, which would make the unjust enrichment remedy available." *Id.*[12]

It is clear that Plaintiffs did not perceive this problem when they filed their amended complaint, since they would surely not have filed an unjust enrichment claim that they knew was invalid. Thus, Plaintiffs only subsequently discovered the need to demonstrate the invalidity of the Agreement. Given that the cross-motion came proximate receiving Defendants' dispositive motion, which undoubtedly prompted Plaintiffs to perform additional legal research, it strongly appears that Plaintiffs cross-moved to amend in July, 1998 reacting to newly discovered law, not newly discovered evidence. As noted above, legal ignorance provides no excuse for delay. *Cresswell v. Sullivan & Cromwell,* 922 F.2d 60, 72 (2d Cir.1990); *cf. PI, Inc. v. Quality Products, Inc.,* 907 F.Supp. 752, 764 (S.D.N.Y.1995) ("When it appears that leave to amend is sought in anticipation of an adverse ruling on the original claims, ... the court is free to deny leave to amend."). Therefore, Plaintiffs have not satisfied their burden of demonstrating a valid excuse for their delay.

Since mere delay is an insufficient grounds for denying a motion to amend, this Court must still consider whether the Defendants will suffer prejudice if the motion is granted. The burden is on the non-movant to demonstrate that the amendment would be prejudicial. *See Fariello v. Campbell,* 860 F.Supp. 54, 70 (E.D.N.Y.1994). In determining what constitutes "prejudice," a court considers "whether the assertion of the new claim would: (i) require the opponent to expend additional resources to conduct discovery and prepare for trial; [or] (ii) significantly delay the resolution of the dispute...." *Block v. First Blood Assocs.,* 988 F.2d 344, 350 (2d Cir.1993) (citations and internal quotations omitted). "[T]he longer the period of an unexplained delay, the less will be required of the non-moving party in terms of a showing of prejudice." *Id.*

Defendants argue that they will be substantially prejudiced because the amendment comes after the close of discovery and after they served their motion papers, and because it substantially alters Plaintiffs' theory of the case. Plaintiffs argue that Defendants have suffered no prejudice because, except for the allegations supporting scienter, the fraud claim rests

---

12. As discussed below, Plaintiffs' legal conclusion that fraud is grounds for rescinding the contract, while close to the truth, is not wholly accurate. However, the fact that they were objectively mistaken is not relevant to determining their subjective motivation.

on facts already alleged in the Amended Complaint, i.e. the misrepresentations, and that issues related to these alleged misrepresentations were pursued in discovery.

Plaintiffs' argument has some merit. Certainly, Defendants are prejudiced less by the addition of a claim closely related to the existing facts than to the addition of a wholly unrelated claim. It does not follow, however, that they suffer no prejudice. Plaintiffs' current claims rest solely on the falsity of Commander's representations. By adding the claim of fraud, Plaintiffs would put Commander's knowledge of that falsity at issue. It is clear that an allegation that Commander knew of the falsity of a fact would justify discovery that might not be pursued in response to the mere allegation of an erroneous statement. Further, although prejudice is defined as having to conduct additional discovery, the fact that the time for discovery in this case is closed does not, of course, eliminate the concern. To the contrary, a finding of prejudice is further warranted where as here discovery and motion deadlines have passed and a case is trial-ready. *Cf. Dluhos v. Floating and Abandoned Vessel,* 162 F.3d 63, 70 (2d Cir.1998) (finding no "undue prejudice ... given that the litigation did not appear to be anywhere near substantive resolution at the time of the ... decision.").

Prejudice is also suggested by the fact that the cross-motion was made after the serving of a motion for summary judgment. Courts have often found that a motion to amend made after a summary judgment motion is filed, particularly when discovery is also closed, raises concerns of prejudice that justify denial of the motion. *See Ansam Assoc., Inc. v. Cola Petroleum, Ltd.,* 760 F.2d 442, 446 (2d Cir.1985) (upholding a denial of leave to amend a complaint in part because "permitting the proposed amendment would have been especially prejudicial given the fact that discovery had already been completed and (the defendant) had already filed a motion for summary judgment");

*CL–Alexanders Laing & Cruickshank v. Goldfeld,* 739 F.Supp. 158, 167 (S.D.N.Y. 1990) ("When the motion [to amend] is made after discovery has been completed and a motion for summary judgment has been filed, leave to amend is particularly disfavored because of the resultant prejudice to the defendant.").

Here, because the cross-motion to amend was served in response to Defendants' initial moving papers, Defendants had opportunity to respond to the new claim in their memorandum replying to Plaintiffs' opposition. Thus, the prejudice was somewhat mitigated. However, the opportunity to file a short reply memorandum is no substitute for full motion practice, both in terms of the extent of the treatment allowed and the time a party will have in which to discover and review evidence and prepare legal arguments. Thus, the timing in this case certainly gave rise to some amount of prejudice.

Plaintiffs argue that a party having made a dispositive motion would be prejudiced by an amendment only where the movant seeks to add a claim based largely on new factual allegations. They note again that here, the fraud claim largely rests on previous allegations. However, as this Court has already noted, the distinction only suggests that the degree of prejudice in this case is less than it might be in another case. It does not bar a finding of prejudice. *See, e.g., MacDraw, Inc. v. The CIT Group Equip. Fin., Inc.,* 157 F.3d 956, 962 (2d Cir.1998) (affirming denial of leave to amend action alleging fraud to add claim for negligent misrepresentation); *Church of Scientology Int'l v. Time Warner, Inc.,* No. 92 CIV. 3024, 1998 WL 575194, at *3 (S.D.N.Y. Sept. 9, 1998) (denying leave to add a libel action a claim for nominal damages based on assertion that statements were "demonstrably false"). This Court finds that in light of the length of the unexcused delay, the prejudice that results from the motion practice completed and the need for additional discovery and motion practice to address a fraud claim

(or the inability to do the same) is sufficient to warrant denial of Plaintiffs' cross-motion.

Of course, a defense of fraud, which Plaintiffs have already alleged, might mitigate the prejudice if such a defense were valid. In that event, Defendants could suffer little prejudice in having to litigate as a claim precisely the same legal issue that they would already have to confront as a defense. However, in this case, Plaintiffs' defense of fraud is clearly invalid as it pertains to Defendants' contract claim.[13]

■■■ Where a party has been induced to enter a contract by fraudulent misrepresentations, the party is entitled to rescind the contract. *See Michael Burstyn v. Raymond Horl,* No. 84 Civ. 3064, 1985 WL 260, at *1 (S.D.N.Y. Feb. 8, 1985). By extension, fraud under these circumstances is a defense to a breach of contract claim. *See Mix v. Neff,* 99 A.D.2d 180, 473 N.Y.S.2d 31, 33 (N.Y.App.Div.1984).

■■■ However, the right to such recision may be waived by the defrauded party. Under New York law, "one who continues, after knowledge of the fraud, to accept the benefits of the contract, may not later be heard to ask for a recision." *Kurrus v. Kurrus,* 136 N.Y.S.2d 395, 397 (N.Y.Sup.Ct.1954); *see also Cobb v. Hatfield,* 46 N.Y. 533, 1871 WL 9835 (1871) (holding that party to contract could not "with knowledge of the fraud which had been practiced upon him, take any benefit under the contract, or change the condition of the property ... and then repudiate the contract" because the "taking of a benefit is an election to ratify it"); *Jackson v. Howard,* 260 A.D. 1056, 24 N.Y.S.2d 488 (N.Y.App.Div.1940) (holding that plaintiffs were not entitled to an action for recision on contract for sale of real property based on fraud when they had treated contract as valid for more than a year after discovering the fraud); *cf. McKeon v. Prudential Lines, Inc.,* 108 Misc.2d 873, 438 N.Y.S.2d 960, 963–64 (citing *Rosenwasser v. Amusement Enters.,* 88 Misc. 57, 150 N.Y.S. 561 (1917) for the rule that "fraud or illegality in inducing a tenant to make a lease is not a defense in an action for rent so long as the tenant remains in possession of the leased property" and finding that rule "controlling"). In contrast, the defrauded party who continues performance after discovering the fraud is not barred from seeking damages. *See Towers Realty Corp. v. Fox,* 278 A.D. 74, 103 N.Y.S.2d 437, 438 (N.Y.App.Div.1951); *accord Bazzano v. L'Oreal,* No. 93 Civ. 7121, 1996 WL 254873, at *3 (S.D.N.Y. May 14, 1996) (holding that defrauded party may either choose to void the contract and recover paid consideration on an unjust enrichment theory or affirm the contract and pursue a breach of contract remedy).[14] Where the right to have the contract voided for fraud is waived, it necessarily follows that fraud is no defense to a breach of contract claim.

■■■ Thus, Plaintiffs would not be barred here from bringing a claim of fraud seeking damages, as indeed they are now attempting to do with their cross-motion. However, as they have continued to use the property for running races and thus continued to receive the benefits of the Agreement after discovering the fraud, they are barred from alleging fraud as a defense to the Agreement. Because the

---

**13.** This Court need not consider whether Plaintiffs' fraud defense is valid as against Defendants' unjust enrichment claim because, as discussed in detail below, Defendants may not rely on an unjust enrichment claim in any case due to the presence of an express written agreement dealing with the same subject matter. Further, because Defendants' declaratory judgment claim is based on breaches of the contract, the contract analysis above applies as well with regard to these claims.

**14.** This is not contrary to the New York rule which states that a claim for damages as a result of fraud shall not be deemed inconsistent with a claim for recision. *See* N.Y. C.P.L.R. 3002(e). This Court does not here hold that the remedies are inconsistent with each other, but rather that one of the remedies is inconsistent with Plaintiffs' actions.

fraud defense is not valid, Defendants would not be confronted with an allegation of fraud unless the cross-motion were granted. Therefore, the prejudice noted earlier is not obviated by the assertion of the fraud defense. The cross-motion to amend is therefore denied. This Court proceeds to review Defendants' motion for summary judgment on part of Plaintiffs' Amended Complaint and on their own counterclaims.

### B. Standard of Review

The standard of review on a motion for summary judgement is well-established. Summary judgment must be granted when the pleadings, depositions, answers to interrogatories, admissions and affidavits show that there is no genuine issue as to any material fact, and that the moving party is entitled to summary judgment as a matter of law. Fed.R.Civ.P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Lang v. Retirement Living Pub. Co.*, 949 F.2d 576, 580 (2d Cir.1991). The moving party carries the initial burden of demonstrating an absence of a genuine issue of material fact. Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir.1990). Facts, inferences therefrom, and ambiguities must be viewed in a light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Project Release v. Prevost*, 722 F.2d 960, 968 (2d Cir.1983). A genuine issue is an issue that, if resolved in favor of the non-moving party, would permit a jury to return a verdict for that party. *R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 57 (2d Cir.1997) (citing *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505).

When the moving party has met their burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586, 106 S.Ct. 1348. At that point, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56; *Liberty Lobby Inc.*, 477 U.S. at 250, 106 S.Ct. 2505; *Matsushita Elec. Indus. Co.*, 475 U.S. at 587, 106 S.Ct. 1348. Rather, to withstand a summary judgment motion, evidence must exist upon which a reasonable jury could return a verdict for the nonmovant. *Liberty Lobby, Inc.*, 477 U.S. at 248–249, 106 S.Ct. 2505; *Matsushita Elec. Indus. Co.*, 475 U.S. at 587, 106 S.Ct. 1348. Thus, summary judgment is proper where there is "little or no evidence ... in support of the non-moving party's case." *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1223–1224 (2d Cir.1994) (citations omitted).

### C. Motion For Summary Judgment On Plaintiffs' Claims

#### 1. Breach of Contract

Plaintiffs allege that "Defendants [Lebanon Valley] and Commander have breached the Agreement in that the Dragway and other property which they leased to Phoenix Racing are not as represented in the Agreement and cannot be used as provided in the Agreement." Am.Compl. ¶ 48. In addition, Plaintiffs allege that "Defendants have also wrongfully interfered with the use, possession, operation and enjoyment of the Dragway and other leased property by Plaintiffs." *Id.*

Defendants move for summary judgment on part of this claim. Defendants concede that the claim for breach of contract due to wrongful interference raises issues of fact which cannot be resolved by summary judgment. However, they assert that the breach of contract claim is deficient as a matter of law insofar as it rests on alleged misrepresentations.

Defendants' primary argument is that sections 7 and 8 of the Agreement constitute "merger" clauses which preclude any claim based on representations not made within the Agreement itself. Section 7,

entitled "Purpose and Effect," states in relevant part:

> The purpose of this Agreement is to outline the substantive terms of the Lease. Any precontractual liability for any act or omission, or any express or implied business combination, partnership or venture of the parties under the principles outlined in this letter, is expressly excluded.

Cohen Aff. Ex. B. Section 8, entitled "Entire Agreement," states:

> The foregoing constitutes the entire agreement between the parties and may be modified only by a writing signed by both parties.

*Id.*

 "[T]he purpose of a general merger provision, typically containing the language ... that [the Agreement] 'represents the entire understanding between the parties,' is to require full application of the parol evidence rule in order to bar the introduction of extrinsic evidence to vary or contradict the terms of the writing." *Primex Int'l Corp. v. Wal–Mart Stores*, 89 N.Y.2d 594, 599, 657 N.Y.S.2d 385, 679 N.E.2d 624 (N.Y.1997). "The merger clause accomplishes this objective by establishing the parties' intent that the Agreement is to be considered a completely integrated writing." *Id.* "A completely integrated contract precludes extrinsic proof to add to or vary its terms." *Id. See also Brower v. Nydic, Inc.*, 1 F.Supp.2d 325, 327 (S.D.N.Y.1998). It is clear that section 8, quoted above, constitutes a merger clause and that extrinsic proof of representations made by Commander is therefore not admissible to add to or vary the terms of the Agreement in this action.

Plaintiffs argue that both sections 7 and 8 are too vague and ambiguous to act as merger clauses. As noted, however, the language used in section 8 is the traditional language used to constitute a merger clause and is therefore not ambiguous at all in its legal effect. *See Primex Int'l Corp.*, 89 N.Y.2d at 599, 657 N.Y.S.2d 385, 679 N.E.2d 624. Plaintiffs cite no cases stating that the language at issue does not constitute a merger clause, nor has this Court been able to find one. Thus, to the extent that Plaintiffs rely on extrinsic evidence of oral representations to vary or contradict the terms of the Agreement, their claim must fail.

Plaintiffs' claim clearly rests on oral representations allegedly made by Commander prior to the formation of the Agreement. For example, they allege that he asserted that he owned six hundred acres of land zoned for recreational/commercial use, including land on either side of a lengthy stream referred to as the Kinderhook Creek. *See* Pl. Concise Stmt. of Material Facts (hereinafter "Pl. Stmt.") at 22, 30; Mullen Aff.Ex. K, Vol. I at 59, 75. Plaintiffs assert that in actual fact, the land on the north side of the Creek, the side opposite to that on which the Dragway was located, could not be used to expand pit area facilities (where racing vehicles can be parked) because it was zoned for residential use only, and because the existence of a fisherman's easement all along the Creek barred Plaintiffs from building the necessary bridge to the Dragway.

Commander also allegedly made a number of representations regarding the political feasibility of developing the Dragway. He represented that any additional permits or approvals required to expand or improve the Dragway could be obtained without difficulty, in part because a majority of the local town board were favorable to Commander and his drag racing operation. Pl. Stmt. at 23–24. Commander also represented that Phoenix Racing would not face opposition to the development from local community groups. *See* Mullen Aff.Ex. K, Vol. II at 25 ("Howard specifically said you are not going to have to deal with what you have been doing in the past, with these other groups that are trying to stop you. We have been here, we are running, that is not going to be an issue."). In fact, Plaintiffs' efforts to develop the

Dragway Facility did result in local political opposition. Am. Compl. ¶ 34; Pl. Stmt. at ¶ 31.

■ Plaintiffs assert that Commander's misrepresentations constitutes a breach of the Agreement. However, Commander's statements are clearly oral representations extrinsic to the terms of the Agreement. Thus, Plaintiffs are barred by the merger clause from asserting that they are part of the terms of the Agreement.

Plaintiffs argue that the merger clause does not bar their reliance on representations, because such representations do not "vary or contradict" the terms of the Agreement, but merely "supplement" its terms. Pl. Mem. In Opposition at 11. However, Plaintiffs' distinction has clearly not been adopted by the New York courts. *See Primex Int'l Corp.*, 89 N.Y.2d at 601, 657 N.Y.S.2d 385, 679 N.E.2d 624 (finding merger clause in "1995 Agreement" was not a bar to enforcement of earlier agreements where prior agreements "will have no effect of varying *or adding to* the terms of the 1995 Agreement") (emphasis added). Nor does this Court find it to have any intuitive appeal. Rather, to add terms to an agreement would clearly vary that agreement's terms, insofar as the terms of the "supplemented" agreement would no longer be the same as the terms of the written one. Thus, even assuming that the representations merely added to the terms of the Agreement, they are still barred by the merger clause.

Plaintiffs also argue that the Agreement specifically provides that they may rely on such representations. They cite to section 4.1 of the Agreement. This provision states in part:

> The shareholders of Lebanon Valley (the "Shareholders") hereby appoint Howard Commander as a representative (the "Shareholders' Representative") to represent the Shareholders in connection with the transaction and the negotiation of the Lease. *Phoenix is entitled to rely upon the advice, information and decisions of the Shareholders' Represen-*

*tative* without any independent authorization or authentication of such advice, information and decisions by the Shareholders.

Mullen Aff.Ex. A at 6–7, § 4.1 (emphasis added). Plaintiffs assert that, under this provision, they are entitled to rely on Commander's precontractual representations and enforce the same as if incorporated in the Agreement.

However, it is a "well settled rule of contract construction that an agreement should be interpreted ... to give meaning to all of its terms and provisions." *Mir v. Mir*, 135 A.D.2d 690, 522 N.Y.S.2d 590, 591 (N.Y.App.Div.1987); *see also Two Guys from Harrison–N.Y., Inc. v. S.F.R. Realty Assocs.*, 63 N.Y.2d 396, 403, 482 N.Y.S.2d 465, 472 N.E.2d 315 (N.Y.1984) ("[i]n construing a contract, one of a court's goals is to avoid an interpretation that would leave contractual clauses meaningless.").

■ To interpret section 4.1 in the fashion suggested by Plaintiffs, i.e. to incorporate any and all precontractual representations into the contract, would completely deprive the merger clause of the effect which courts have repeatedly held such language to have. Indeed, it is not apparent that the clause would have any meaning; certainly, Plaintiffs do not suggest any. Further, section 4.1 on its face appears intended merely to establish Commander's authority to act on behalf of Lebanon Valley's shareholders. Therefore, Plaintiffs' proposed interpretation of section 4.1 as allowing reliance on pre-contractual oral representations must be rejected.

Finally, Plaintiffs argue that the Agreement itself specifically incorporates the substance of Commander's representations. They point to section 3.7, which provides: "This Lease includes the right of Phoenix to use all land owned or controlled by Lebanon Valley and Howard Commander for parking or uses in [§ ] 3.15." Mullen Aff.Ex. A at 4, § 3.7. Section 3.15 refers to improvements "including but not

limited to new roadways, new concession areas, pit areas, track improvements, new track areas, parking areas, camping areas, towers, [and] spectator stands...." Mullen Aff.Ex. A at 6, § 3.15. Plaintiffs assert that this language constitutes a warranty that the land "owned or controlled by Lebanon Valley and Howard Commander" is "suitable" for these purposes.

 Language indicating that the lessee is granted the right to a particular use is ordinarily construed as merely describing the purposes for which the property is being leased. *See Foresee Corp. v. Pergament Enterprises of S.I.*, 198 A.D.2d 397, 604 N.Y.S.2d 123, 124 (N.Y.App.Div.1993); *57th Street Luce Corp. v. General Motors Corp.*, 182 Misc. 164, 46 N.Y.S.2d 730, 733 (N.Y.Sup.Ct.) (citing *Barnett v. Clark*, 225 Mass. 185, 114 N.E. 317 (1916) with approval for proposition that granting of right to use property for particular purpose creates no implied warranty that the premises were usable for that purpose), *aff'd*, 48 N.Y.S.2d 557 (N.Y.App.1944), *aff'd*, 293 N.Y. 717, 56 N.E.2d 732 (N.Y. 1944). Noticeably lacking in the quoted sentence is any statement that Defendant "warranted," "represented" or "guaranteed" anything regarding the property. In contrast, the next sentence of the provision states that "Lebanon Valley and Howard Commander hereby represent that they own or control land identified according to local assessors maps as follows...." Mullen Aff.Ex. A at 4, § 3.7. Thus, there is no reason to believe that the language quoted by Plaintiffs was not being used to communicate its ordinary meaning.

The problematic nature of Plaintiffs' interpretation of section 3.7 is also evident in the vagueness of the right Plaintiffs assert. They claim that the provision guarantees that the land will be "suitable" for the purposes defined. However, nowhere in the Agreement is "suitability" defined, and the Agreement expressly contemplates the possibility that public "authorizations to make improvements" may be required. Mullen Aff.Ex. A at 5, § 3.12. The Agreement expressly guarantees that Lebanon Valley will "cooperate" with Phoenix Racing in applying for such authorizations, but provides no guarantee that the applications would be granted.

Given the underlying allegations in this case, Plaintiffs would perhaps argue that the provision at least guarantees that no encumbrances or zoning regulations will bar the asserted uses. However, the language is clearly inadequate to support such a meaning. Not only does section 3.7 make no express guarantee, warranty or representation with regard to zoning laws and encumbrances, it makes no reference to such things at all. Thus, it fails to provide a basis for Plaintiffs' claim for breach of contract, and Defendants' motion for partial summary judgment on this claim must be granted.

### 2. Breach of the covenant of Good Faith

Plaintiffs assert in their First Amended Complaint that "[t]he Agreement contained implied promises by defendants ... that the property being leased thereunder could be developed into and used as a host dragway for national drag racing events(s) of the NHRA, that defendants ... would do nothing which would hinder or obstruct such development and use of the property, and that defendants ... would otherwise observe the covenant of good faith and fair dealing...." Am. Compl. ¶ 51. Plaintiffs claim that Defendants breached the implied covenant of good faith and fair dealing in eight respects. *See* Am. Compl. ¶ 52. Defendants move for summary judgment only as to alleged breaches (i)–(iii) and (viii): that "(i) the Dragway and other property which they leased to plaintiffs could not be developed into and used as a host dragway for national drag racing event(s) of the NHRA; (ii) they misrepresented the suitability of the Dragway and the other leased property for such development and use; (iii) they failed to disclose the land use restrictions and other infirmities that precluded such development and use; ... and (viii) they have actively re-

fused to permit Plaintiffs to conduct an investigation of the business and operations of [Lebanon Valley]." Am. Compl. ¶ 52.

▉▉▉ "Implicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance." *Dalton v. Educational Testing Serv.,* 87 N.Y.2d 384, 389, 639 N.Y.S.2d 977, 663 N.E.2d 289 (N.Y.1995). Under this implied covenant, a party is prohibited from acting in a manner "which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Id.* (citation and internal quotations omitted). However, "such an implied covenant relates only to the performance of obligations under an extant contract, and not to any pre-contract conduct." *The Independant Order of Foresters v. Donald, Lufkin & Jenrette, Inc.,* 157 F.3d 933, 945 (2d Cir.1998); *see also M/A–COM Security Corp. v. Galesi,* 904 F.2d 134, 136 (2d Cir.1990) ("where a party's acts subsequent to performance on the contract so directly destroy the value of the contract for another party that the acts may be presumed to be contrary to the intention of the parties, the implied covenant of good faith is implicated.") (citing *Roli–Blue, Inc. v. 69/70th Street Assocs.,* 119 A.D.2d 173, 506 N.Y.S.2d 159 (N.Y.App.Div.1986)); *Joseph Victori Wines, Inc. v. Vina Santa Carolina S.A.,* 933 F.Supp. 347, 353 (S.D.N.Y.1996) (refusing to apply duty of good faith and fair dealing to a termination provision because the duty applies "only to the exercise of obligations which parties owe to each other during the term of a contract"); *Bank of New York v. Sasson,* 786 F.Supp. 349, 354 (S.D.N.Y.1992) (holding that "the implied covenant of good faith and fair dealing is limited to performance under a contract"). The first three claims for breach arise out of the alleged misrepresentations and omissions that oc-

curred during negotiations prior to the formation of the contract. Thus, they do not address any action taken by Defendants during performance which had the effect of preventing Plaintiffs from receiving the benefits of their lease, and therefore do not support a claim for breach of the duty of good faith and fair dealing.[15]

▉▉▉ Arguably, the third claim alleging a breach resulting from omissions could be interpreted to allege a non-disclosure occurring after formation of the contract. However, even so construed, the claim is still not legally sufficient. To demonstrate a breach of the covenant of good faith and fair dealing, parties must generally show that they have been deprived of a contract right by an affirmative act, not merely a failure to act. *See, e.g., M/A–COM Sec. Corp. v. Galesi,* 904 F.2d 134, 136 (2d Cir.1990) (holding that under the implied covenant of good faith, "neither party to a contract shall *do* anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract.") (emphasis added); *Leberman v. John Blair & Co.,* 880 F.2d 1555, 1560 (2d Cir.1989) ("The covenant of good faith and fair dealing 'precludes each party from *engaging in conduct* that will deprive the other party of the benefits of their agreement' ") (emphasis added). A failure to disclose information where such disclosure was not expressly required might still constitute a breach of the covenant of good faith where a promise to disclose such information is "so interwoven in the whole writing" of the contract as to be necessary for effectuation of the purposes of the contract. *Brocklesby Transport v. Eastern States Escort,* 904 F.2d 131, 134 (2d Cir.1990). However, it is established that the duty of good faith and fair dealing "cannot be used to create new contractual rights between the parties." *See In re Houbigant,* 914 F.Supp. 964, 995

---

**15.** A breach of the covenant of good faith and fair dealing for precontractual conduct would also appear to be barred by the terms of the Agreement itself. Section 7 expressly pro-

vides that "[a]ny precontractual liability for *any act or omission* ... is expressly excluded." (Emphasis added).

(S.D.N.Y.1995). Thus, the doctrine should be applied only where an obligation is necessarily implied by express provisions or where the imposition of the obligation is necessary to protect the parties' reasonable expectations. *See M/A–COM Security Corp. v. Galesi,* 904 F.2d 134, 136 (2d Cir.1990).

Nothing in the Agreement reasonably implies any obligation on the Defendants' part to perform any kind of unilateral disclosure after formation of the contract. In stark contrast to the silence of the Agreement on any duty of disclosure, section 5 of the Agreement expressly provided Plaintiffs with a right to investigate Lebanon Valley's operations and business. *See* Mullen Aff.Ex. A. at 5. Further, the implication of a right to disclosure is not necessary to the effectuation of the Agreement's terms. Plaintiffs could have learned about property encumbrances by inquiries into the property title without any disclosure by the Defendants. Indeed, Plaintiffs do not claim that they were unable to discover the alleged encumbrances on the property after the formation of the contract. They have also not suggested how disclosure of the alleged unsuitability of the property after the formation of the contract was necessary to effectuate any right expressly provided for by the Agreement. Thus, there is no allegation that Defendants' failure to disclose prevented them from exercising any rights under the Agreement. In sum, Plaintiffs have not alleged in the first three claims that Defendants destroyed or injured a contract right which Plaintiffs possessed. Therefore, Defendants' motion for summary judgment is granted as to the first three allegations of Plaintiffs' claim for breach of the covenant of good faith and fair dealing.

However, the eighth claim, which alleges that Plaintiffs were not allowed to investigate the operations of Lebanon Valley, does address performance of obligations under the contract, and properly asserts the impairment of a contractual right. Section 5 of the Agreement provides that "Vincent Barletta as Phoenix Racing's representative will be permitted to conduct a full investigation of the business and operations of Lebanon Valley and will have the right to consult with management personnel of Lebanon Valley." Mullen Aff.Ex. A. In an affidavit, Barletta alleges that "I have asked on numerous occasions to inspect all concession related records and have not been permitted to do so." Mullen Aff.Ex. F at 7, ¶ 16. A question of fact having been raised on the eight allegation, Defendants' motion for summary judgment must be denied. Therefore, allegations one through three are dismissed, and allegations four through eight must be submitted to the trier-of-fact.[16]

### 3. Unjust Enrichment

In this claim, Plaintiffs allege that Defendants have been benefited by the improvements which Plaintiffs have made to the property, and that, absent compensation to the Plaintiffs, Defendants will be unjustly enriched.

It is established that "the existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi-contract [*i.e.,* unjust enrichment] for events arising out of the same subject matter." *MacDraw, Inc. v. CIT Group Equip. Fin., Inc.,* 157 F.3d 956, 964 (2d Cir.1998) (alteration in original) (citation and internal quotations omitted); *see also*

---

**16.** It is noted that because the implied covenant of good faith and fair dealing is an implied contractual term, "breach of that duty is merely a breach of the underlying contract." *Fasolino Foods Co., Inc. v. Banca Nazionale del Lavoro,* 961 F.2d 1052, 1056 (2d Cir.1992). Because Plaintiffs have also alleged a breach of contract claim, a claim for breach of the duty of good faith and fair dealing might be subject to dismissal for redundancy. *See In re Houbigant,* 914 F.Supp. 964, 989 (S.D.N.Y.1995). However, it is clear that, in one form or another, the claim may proceed based on allegations four through eight.

*City of Yonkers v. Otis Elevator Co.*, 844 F.2d 42, 48 (2d Cir.1988) (holding that quasi-contractual relief "is unavailable where an express contract covers the subject matter."). Here, the Agreement specifically addresses the issue of who bears the financial responsibility for the costs of capital improvements. *See* Mullen Aff.Ex. A at 3, § 2.3. Thus, this claim is barred, and Defendants' motion for summary judgment on this claim must be granted.

Plaintiffs assert that the unjust enrichment claim should be upheld based on this Court's previous Memorandum–Decision and Order, Dkt. No. 76, filed on August 19, 1998, which *inter alia* denied Defendant Commander's motion to dismiss the complaint. In that decision, this Court addressed Commander's assertion that he signed the Agreement solely in a representative capacity and that he thus was not individually liable in this action. This Court found that he was individually liable under the Agreement, and went on to conclude that "[i]n any event, the third and fourth causes of action [for unjust enrichment and promissory estoppel, respectively] would state a claim against Commander even if he were not obligated under [the Agreement]." Memorandum–Decision and Order at 11.

Under the "law of the case" doctrine, "when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case." *Prisco v. A & D Carting Corp.*, 168 F.3d 593, 607 (2d Cir. 1999). "The rule is not absolute, however." *Id.*; *see also Sagendorf–Teal v. County of Rensselaer*, 100 F.3d 270, 277 (2d Cir.1996) ("Application of the law of the case doctrine is discretionary and does not limit a court's power to reconsider its own decisions prior to final judgment."). In any event, this Court does not depart from the law of the case in finding the unjust enrichment claim invalid.

This Court previously noted that unjust enrichment was available only where there was no valid and enforceable written contract governing the subject matter. Memorandum–Decision and Order at 12. In concluding that unjust enrichment was therefore an "alternative theory of recovery against defendant Commander," this Court only implicitly assumed, in the context of a motion to dismiss, that Plaintiff could ultimately prove that the existing contract was invalid or unenforceable. Thus, it did not hold as the law of the case that Plaintiff had actually provided evidence which would support such a conclusion. In the context of the instant motion for summary judgment, Plaintiff has put forth no grounds which would support a finding that the contract is unenforceable or invalid. Plaintiffs' defense of fraud fails as a matter of law to void the contract for the reasons discussed above, and they have not offered any alternative grounds on this motion to vitiate the contract or render it unenforceable.

Even were the law of the case as Plaintiffs represent, departure would be warranted. The major reasons justifying departures include "'an intervening change of controlling law, the availability of new evidence, or the need to correct clear error or prevent manifest justice.'" *Virgin Atl. Airways v. National Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir.1992) (quoting 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure § 4478 (1981)); *see also Rodriguez v. Olaf Pedersen's Rederi A/S*, 387 F.Supp. 754 (E.D.N.Y.1974), *aff'd* 527 F.2d 1282 (2d Cir.1975), *cert. denied*, *American Stevedores, Inc. v. Olaf Pedersen's Rederi A/S*, 425 U.S. 951, 96 S.Ct. 1726, 48 L.Ed.2d 195 (1976) (finding that prior ruling does not relieve a district court of its obligation to present the Court of Appeals with what it believes to be a correct judgment). Where a reason to depart from the law of the case is evident, the "decision whether or not to apply law-of-the-case is ... informed principally by the concern that disregard of an earlier ruling not be allowed to prejudice the party seeking the benefit of the doctrine."

*Prisco,* 168 F.3d at 607 (alterations in original) (citation and internal quotations omitted). "Prejudice" in this context means a lack of "sufficient opportunity to prepare armed with the knowledge that the prior ruling is not deemed controlling." *Id.* (citation and internal quotations omitted).

In this case, upholding the validity of the unjust enrichment claim would be clear error for the reasons discussed above. Further, there is no prejudice to Plaintiffs, since Plaintiffs served their papers in opposition to Defendants' motion prior to the filing of this Court's previous ruling. In their memorandum, Plaintiffs fully briefed and argued the validity of their unjust enrichment claim. Therefore, prejudice would present no reason not to depart from the law of the case, assuming that this Court were required to do so. Accordingly, Defendants are granted summary judgment on the unjust enrichment claim in its entirety.

*4. Promissory Estoppel*

Plaintiffs assert in their fourth cause of action that Defendants made a number of unambiguous promises which Plaintiffs relied upon to their detriment. They assert that these promises are enforceable under the theory of promissory estoppel. Defendants move for summary judgment on the fourth cause of action in its entirety.

■ Promissory estoppel is a "narrow doctrine designed to enforce a contract in the interest of justice where some contract formation problem would otherwise prevent enforcement." *In re Gulf Oil/Cities Service Tender Offer Litigation,* 725 F.Supp. 712, 735 (S.D.N.Y.1989); *see also Bell v. Leakas,* 90 Civ. 7981, 1993 WL 77320, *9 (S.D.N.Y. March 13, 1993) (" 'Promissory estoppel is a legal fiction designed to substitute for contractual consideration where one party relied on another's promise without having entered into an enforceable contract.' ") (quoting *Hartford Fire Ins. Co. v. Federated Dep't Stores, Inc.,* 723 F.Supp. 976, 993 (S.D.N.Y.1989)). Thus, "[a]n action for

promissory estoppel generally lies when there is no written contract, or the contract cannot be enforced for one reason or another." *NCC Sunday Inserts Inc. v. World Color Press, Inc.,* 759 F.Supp. 1004, 1011 (S.D.N.Y.1991); *see also Cyberchron Corp. v. Calldata Systems Development,* 831 F.Supp. 94, 112 (E.D.N.Y.1993) (holding that promissory estoppel is "applicable only in the absence of an enforceable contract"), *aff'd in relevant part, vacated in part,* 47 F.3d 39, 45 (2d Cir.1995) (upholding application of promissory estoppel as a substitute for consideration); *Bell,* 1993 WL 77320, *9 (finding that, even if agreement were found to contain alleged promises, appropriate theory of recovery would be an action for breach of contract and dismissing promissory estoppel claim).

■ Here, Plaintiffs assert that Defendants promised:

(a) that defendants had and would maintain all permits and approvals to operate the Dragway and the other leased property; (b) that defendants could obtain and arrange for the permits and approvals necessary to operate, develop, upgrade and improve the Dragway and other leased property into a host dragway for a national drag racing event of the NHRA; (c) that defendants would make available land adjoining the Dragway facility and occupied by the asphalt plant; (d) that defendants would operate food and beverage concessions subject to the direction and control of Plaintiffs; (e) that sponsorship income from new contracts would belong to Plaintiffs; and (f) that defendants would permit Plaintiffs to conduct a full investigation of the business and operations of [Lebanon Valley.]

Mullen Aff. Ex. B at ¶ 58. Plaintiffs concede that promises (a), (d), (e) and (f) are drawn directly from provisions of the Agreement. Further, it is clear that promise (c) arises from the Agreement. *See* Mullen Aff. Ex. A at 2, § 2.0 (stating that the lease is to "include all property ...

used in conjunction with the operation of the Dragway, including usage of the residence and other land owned or controlled by Howard Commander abutting and across the street from the Dragway Facility"); Am. Compl. ¶ 33 ("much of the area occupied by the asphalt plant has been denied to Plaintiffs for use as a Dragway parking area and for other improvements as intended under the Agreement."). Because Plaintiffs have not alleged any grounds for finding that the contract is either invalid or unenforceable, promissory estoppel is unavailable to enforce these promises.

■ Promise (b), a promise to obtain such new permits and approvals as are necessary to improve the facility, is not contained in the Agreement. Section 3.12, the most applicable section, states only that Lebanon Valley will maintain existing permits at its cost and "shall cooperate with Phoenix in applying for any authorizations to make improvements." *See* Mullen Aff. Ex. A at 5, § 3.12. Defendants allege that the Agreement actually contradicts the asserted promise, relying on another sentence in § 3.12: "Lebanon Valley will not be responsible for legal fees arising from Dragway Facility operations." Mullen Aff. Ex. A at 5. However, regardless of whether the alleged promise is contradicted by this provision, the claim must be rejected. To establish a cause of action for promissory estoppel under New York law, "plaintiff must allege (1) a clear and unambiguous promise, (2) reasonable and foreseeable reliance by the party to whom the promise ·is made, and (3) an injury sustained in reliance on the promise." *Gurreri v. Associates Insurance Co.*, 248 A.D.2d 356, 669 N.Y.S.2d 629, 631 (N.Y.App.Div.1998) (citation and internal quotations omitted). Here, Plaintiffs have provided no evidence of a clear and unambiguous promise to obtain new permits and approvals. Further, given the unambiguous merger clause, it would not have been reasonable for Plaintiffs to rely on promises other than those contained within the Agreement itself. Therefore, Defendants'

motion for summary judgment on the promissory estoppel cause of action in its entirety is granted.

### D. Motion For Summary Judgment on Counterclaims

Defendants have alleged three counterclaims: breach of contract, declaratory judgment and unjust enrichment. They now move for summary judgment on all three claims.

#### 1. Breach of Contract

In their first counterclaim, Defendants allege that Phoenix Racing breached the Agreement by failing to make payments of rent and by failing to pay one-third of the property taxes and electricity charges. Defendants allege that the breach is ongoing.

It is clear that the Agreement imposes a duty on Phoenix Racing to pay rent and a portion of property taxes and overhead costs. The section of the Agreement addressing rent states in relevant part:

> Phoenix will pay Lebanon Valley an annual lease payment for the first year of $80,000.00. The annual lease payment for years 2 through 18 will be a minimum annual lease payment of $60,-000.00.... Annual lease payment shall be paid semiannually on April 1 and October 1 of each year.

Mullen Aff. Ex. A at 2, § 2.2. With regard to property taxes, the Agreement states that "Phoenix shall pay any increase in real estate taxes over current assessments attributable to improvements made by Phoenix to the Dragway Facility and one-third (⅓) current total Dragway Facility taxes." Mullen Aff. Ex. A at 3, § 2.4. With regard to payment of electricity charges, section 3.6 of the Agreement, entitled "Overhead and/or Expense Reimbursement," states in part that

> Lebanon Valley agrees to provide Phoenix with overhead services as Phoenix may require. Phoenix agrees to reimburse Lebanon Valley for its proportion-

ate share of any such expenses it incurs on behalf of and at the request of Phoenix.

Mullen Aff. Ex. A at 4, § 3.6.

Defendants allege without dispute that Phoenix Racing failed to make its semiannual payments of $30,000.00 starting with the payment due on April 1, 1996. However, since this Court has previously ordered Plaintiffs to make payments of rent, including "all rents due and in arrears," Dkt. No. 76, Memorandum–Decision and Order at 12, this breach of the Agreement has presumably been cured and the claim is moot. Summary judgment is therefore unwarranted.

Defendants allege that Phoenix Racing has failed to pay its share of property taxes and overhead. Plaintiffs deny that they have failed to pay their share of real estate taxes but admit that they have not paid 1996 and 1997 electricity charges. See Pl. Reply to Counterclaims ¶¶ 87, 91.

With regard to electricity charges, Plaintiffs assert that there is no breach because the amounts owing may be offset if the Defendants are also found to have breached the Agreement. Plaintiffs also argue that, because this Court ordered a Yellowstone injunction, there can be no breach as a matter of law.

■■■ However, insofar as Plaintiffs do not deny failing to pay electric charges, summary judgment is warranted as to liability for the default. The Yellowstone injunction only extends the period in which Plaintiffs may cure the default and avoid the consequences for default spelled out in the Agreement; it does not erase the fact that Plaintiffs failed to perform an obligation required by the Agreement. However, because the record does not present evidence which would enable this Court to determine the amount owing as a matter of law, summary judgment is denied as to the amount of overhead due.[17] Further, Defendants have not presented undisputed evidence of a default or of the amount. Their only evidence is the bare assertion of default in their "Statement of Undisputed Facts," see Dkt. No. 79 at ¶ 27. However, this assertion was not accompanied by a citation to the record as required by Local Rules, see N.D.N.Y. L.R. 7.1(f) (pre–1999 version) (currently found at N.D.N.Y. L.R. 7.1(a)(3)). Thus, the assertion does not constitute evidence. Therefore, summary judgment is denied as to the payment of real estate taxes.

## 2. Declaratory Judgment

Defendants seek a judgment declaring that (1) Phoenix Racing breached the Agreement by failing to make rent payments; (2) Phoenix Racing breached the Agreement by failing to pay its share of property taxes; (3) Phoenix Racing breached the Agreement by failing to pay its share of overhead expenses; (4) as a result of these breaches, Lebanon Valley is entitled to terminate the Agreement; and (5) all improvements made by Phoenix Racing are now the exclusive property of Lebanon Valley.

■■■ The decision to grant declaratory relief rests in the sound discretion of the district court. See Christopher P. By Norma P. v. Marcus, 915 F.2d 794, 802 (2d Cir.1990). A district court should entertain a claim for declaratory relief "(1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, or (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to

---

**17.** In his affidavit, Barletta asserts that the only electrical charges which were authorized by Phoenix Racing for 1996 were in the amount of $7,000.00, not the $11,758.96 which Defendants have allegedly billed them. See Mullen Aff. Ex. F, ¶ 17. Because the Agreement specifies that Phoenix Racing is liable only for expenses "for actual approved costs incurred on behalf of and at *the request of* Phoenix," Mullen Aff. Ex. A at 4, Barletta's allegation clearly present a material question of fact relevant to determining overhead charges.

the proceeding." *Starter Corp. v. Converse, Inc.*, 84 F.3d 592, 597 (2d Cir.1996).

As noted, this Court has already directed the payment of rent, including rent in arrears. No purpose will thus be served in further declaring an obligation to pay rent. Thus, Defendants' motion for summary judgment is denied as to a declaration of a breach of the duty of pay rent is denied. Further, for the reasons explained in addressing Defendants' analogous breach of contract claims, the request for declaration of default on payment of taxes is denied and the request for declaration of default on payment of overhead charges is granted.

The fourth and fifth requests, which seek a declaration that Defendants may terminate the Agreement and claim ownership of the improvements, rest on § 3.9 of the Agreement, which states, in part:

> If Phoenix defaults in payment of annual lease payments or documented overhead expenses as required herein, Lebanon Valley may elect to terminate the Lease and Phoenix will forfeit all rights.

Mullen Aff. Ex. A at 5, § 3.9. However, the provision goes on to state:

> Lebanon Valley shall give Phoenix thirty (30) days prior written notice and an opportunity to cure any default .... Termination of the Lease and retention of improvements shall be Lebanon Valley's sole and exclusive remedy under the Lease if Phoenix fails to commence a cure for such default within said cure period after actual receipt of such notice of default.

*Id.* Thus, Defendants' right to terminate arises only after the end of the cure period. However, by issuing its Yellowstone injunction, this Court effectively extended that period for the duration of the action. Therefore, although there has been a default which triggers § 3.9, Defendants are not yet entitled to exercise the § 3.9 right

to terminate. Accordingly, summary judgment is denied as to requests (4) and (5).[18]

*3. Unjust Enrichment*

Defendants seek the same relief here that they pursue in their breach of contract claim. As noted, this relief is unavailable where a written contract addresses the same subject matter and this claim is therefore barred. A *fortiorari*, summary judgment must be denied.

*III. Conclusion*

For the reasons discussed above, this Court hereby orders as follows:

A. It is ORDERED that Plaintiffs' cross-motion to amend the complaint is DENIED.

B. It is further ORDERED that Defendants' motion for partial summary judgment on Plaintiffs' claims is GRANTED-in-part and DENIED-in-part, as follows:

1. Defendants' motion for partial summary judgment on Plaintiffs' breach of contract claim insofar as the claim rests on asserted misrepresentations is GRANTED.

2. Defendants' motion for partial summary judgment on Plaintiffs' claim for breach of the covenant of good faith and fair dealing is GRANTED as to the first three alleged breaches and DENIED as to the eighth alleged breach.

3. Defendants' motion for summary judgment on Plaintiffs' unjust enrichment claim is GRANTED.

4. Defendants' motion for summary judgment on Plaintiffs' promissory estoppel claim is GRANTED.

C. It is further ORDERED that Defendants' motion for summary judgment on their counterclaims is GRANTED-in-part and DENIED-in-part, as follows:

---

**18.** It is noted that the plain language of § 3.9 does not in any case grant Defendants a right to terminate because of failure to pay property taxes.

1. Defendants' motion for summary judgment on their breach of contract counterclaim is DENIED as moot as to the claim of default of payment of rent, and DENIED as to the claim of default on payment of real estate taxes, and GRANTED as to liability on the claim of default on payment of overhead, specifically payment of electricity charges, but DENIED as to the amount owing.

2. Defendants' motion for summary judgment on their counterclaim for a declaratory judgment is DENIED as to requests (a), (b), (d) and (e) and GRANTED as to request (c), and accordingly, it is declared that Plaintiffs have defaulted on their obligation under the terms of the lease to pay overhead charges.

3. Defendants' motion for summary judgment on their unjust enrichment counterclaim is DENIED.

IT IS SO ORDERED.