LEHMAN BROTHERS COMMERCIAL CORPORATION and Lehman Brothers Special Financing Inc., Plaintiffs,

v.

MINMETALS INTERNATIONAL NON–FERROUS METALS TRADING COMPANY and China National Metals and Minerals Import and Export Company, Defendants.

Minmetals International Non–Ferrous Metals Trading Company, Counterclaim Plaintiff,

v.

Lehman Brothers Inc., Lehman Brothers Asia Limited, Lehman Brothers Securities Asia Limited and Lehman Brothers Capital Co. (H.K.) Limited, Additional Counterclaim Defendants.

No. 94 CIV. 8301(JFK).

United States District Court, S.D. New York.

Dec. 10, 2001.

Cadwalader, Wickersham & Taft, New York City, Of Counsel: Jonathan D. Polkes, Esq., for Plaintiffs and Additional Counterclaim Defendants.

Kaye Scholer Fierman Hays & Handler, New York City, Of Counsel: Aaron Rubinstein, Esq., for Defendants and Additional Counterclaim Plaintiff.

## OPINION and ORDER

KEENAN, District Judge.

Before the Court are supplemental issues stemming from the parties' cross-

motions for summary judgment pursuant to Fed.R.Civ.P. 56.[1]

### Background

The Court assumes familiarity with the facts set forth in the Summary Judgment Opinion and Order of November 13, 2000. *See Lehman Bros. Comm. Corp. v. Minmetals Int'l Non–Ferrous Metals Trading,* No. 94 Civ. 8301, 2000 WL 1702039 (S.D.N.Y. Nov.13, 2000).

### Discussion

#### A. Martin Act Preemption Issue

Defendants allege breach of fiduciary duty, negligence and negligent misrepresentation counterclaims against Lehman with respect to all of the transactions at issue, namely, the foreign exchange transactions ("FX transactions"), the interest-rate swaps and the Thai baht-denominated negotiable certificates of deposit ("NCDs"). The Court directed the Parties to submit supplementary briefs regarding, among other things, Lehman's assertion that New York's Martin Act bars the Defendants' negligent misrepresentation, negligence and breach of fiduciary duty counterclaims. Defendants argue that the Martin Act does not apply in this case because the transactions at issue do not constitute "securities" within the meaning of the Act. Defendants also argue that the transactions were not "within or from" New York, a nexus expressly required under the Martin Act.

New York's Martin Act grants the Attorney General the power to regulate fraud and deception in the sale of securities. *See* N.Y. Gen. Bus. Law § 352[1.]. The Act does not require a showing of intent to defraud or scienter and does not give rise to an implied private right of action. *See CPC Int'l Inc. v. McKesson Corp.,* 70 N.Y.2d 268, 519 N.Y.S.2d 804, 514 N.E.2d 116, 118 (1987). In cases since *CPC International,* courts have stated that the Act not only bars private claims brought directly under the statute, but also precludes common-law claims based on facts that provide the Attorney General grounds for instituting an action under the Act. *See, e.g., Granite Partners, L.P. v. Bear, Stearns & Co.,* 17 F.Supp.2d 275, 291 (S.D.N.Y.1998). Thus, courts have held that the Martin Act preempts claims of negligent misrepresentation, negligence and breach of fiduciary duty predicated on securities fraud. *See Butvin v. Double-Click, Inc.,* No. 99 Civ. 4727, 2000 WL 827673, at *10 (S.D.N.Y. June 26, 2000). The courts so held on the grounds that allowing such claims to proceed is tantamount to permitting a private right of action under the Act because these claims do not require proof of fraudulent intent or scienter. *See id.; Eagle Tenants Corp. v. Fishbein,* 182 A.D.2d 610, 582 N.Y.S.2d 218, 219 (N.Y.App.Div.1992); *see also Castellano v. Young & Rubicam, Inc.,* 257 F.3d 171, at 189–90 (2d Cir.2001).

Defendants argue that the Martin Act does not apply because the transactions at issue did not involve "securities" within the meaning of the statute.[2] With regard to

---

1. For purposes of this supplemental decision, the Court will use the shorthand reference "Lehman" when referring to Plaintiffs and/or Counterclaim Defendants collectively. The Court will refer to Defendants Minmetals International Non–Ferrous Metals Trading Company ("Non–Ferrous") and China National Metals & Minerals Import & Export Corporation ("Minmetals") collectively as

"Defendants," even though Non–Ferrous is also a Counterclaim Plaintiff.

2. In arguing that there is no preemption, the Defendants actually sidestep the issue of whether the NCDs involved securities, even though all of their negligence-based claims are partially based on the NCDs. *See* Defs.' Pretrial Mem. at 41. Perhaps the Defendants did so because in a contemporaneous submis-

the FX transactions, Defendants assert that this Court already found that these transactions were not securities. *See* Defs.' Pretrial Mem. at 41. But in making this argument, Defendants failed to mention that the Court expressed doubt about whether the FX transactions involved securities for purposes of a 10(b) fraud claim, not in relation to the Martin Act, which contains a more expansive definition of the term. Accordingly, the Court must analyze the contours of the term security under the Martin Act.

■ The Martin Act defines securities as "any stocks, bonds, notes, evidences of interest or indebtedness or other securities." N.Y. Gen. Bus. Law § 352[1.]. The statute provides a non-exhaustive list of instruments within the "other securities" catchall, which includes the "foreign currency orders, calls or options" category. *See* N.Y. Gen. Bus. Law § 352[1.]. Lehman argues that the FX transactions fall within this foreign-exchange grouping. The Court disagrees. As Lehman has stated in describing the transactions: "No physical exchange of the underlying foreign currencies took place in connection with the trading activity. The foreign currency trades were placed, and at expiration— when the currency would otherwise change hands—new positions were entered into that either rolled the trades further into the future or offset them with trades taking the opposite position." Williams Aff. ¶ 10. As such, these transactions resemble a contractual wager based on movements in specified foreign-currency prices, without the real possibility of foreign-currency positions changing hands. Unlike with an option, neither party here, for all intents and purposes, had a right to take possession of foreign currency. Accordingly, the

Court concludes that the Martin Act reference to foreign currency orders does not apply to a series of contracts that relate to foreign-currency prices, but, for all practical purposes, really do not anticipate an exchange of foreign currency positions.

■ Although the FX transactions do not fall within the Martin Act's foreign-currency grouping, the analysis of whether these transactions constitute "other securities" does not end there. New York courts have applied the three-part *Howey* test, which is the classic test for determining whether a transaction is an "investment contract" within the meaning of the Securities Act, as a gauge for identifying "other securities" under the Martin Act. *See All Seasons Resorts v. Abrams,* 68 N.Y.2d 81, 506 N.Y.S.2d 10, 497 N.E.2d 33, 39 (1986). Under the *Howey* test, a security is the functional equivalent of an investment contract, which is "a contract, transaction or scheme whereby a person [1] invests his money [2] in a common enterprise and [3] is led to expect profits solely from the efforts of the promoter or a third party." *SEC v. W.J. Howey Co.,* 328 U.S. 293, 298–99, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946).

The Court finds that the FX transactions at issue do not satisfy the commonality prong under the *Howey*-test. To determine if a transaction satisfies the commonality requirement of *Howey* for purposes of the Martin Act, a court must employ the "broad vertical commonality" approach, which requires "that there be a direct nexus between the efforts of the promoter and the return of the investor's investment." *People v. First Meridian Planning Corp.,* 201 A.D.2d 145, 614 N.Y.S.2d 811, 816 (3d Dep't 1994).[3]

sion to this Court, the Defendants argue that the NCDs were securities for purposes of their

federal securities fraud claims. *See* Defs.' Supplemental Br. at 18–20.

**3.** In applying the *Howey* test for purposes of

Based on this definition, the Court finds that the FX transactions do not meet the commonality prong because the structure of the transactions indicates that any gain likely would result in large part from market movements, not from capital appreciation due to Lehman's efforts. Therefore, the FX transactions do not constitute securities under the Martin Act.

■ Because interest-rate swaps are not expressly included within the Martin Act's definition of a security, the Court must consider whether these instruments fall within the "other securities" catchall based on the *Howey* test. At least one court has held that, in the context of a § 10(b) fraud claim, interest-rate swaps are not securities under *Howey*. *See Procter & Gamble Co. v. Bankers Trust Co.*, 925 F.Supp. 1270, 1278 (S.D.Ohio 1996). Based on the reasoning in *Procter & Gamble*, in particular, that interest-rate swaps do not satisfy the third prong of *Howey* because "the value of the swaps depend[ ] on market forces, not [Defendant's] entrepreneurial efforts", *id.*, the Court finds that the swap transactions here do not constitute securities under the Martin Act.

■ Both sides believe that the NCDs involved securities under federal securities law. *See* Pls.' Supplemental Mem. at 11 n. 6; Defs.' Supplemental Mem. at 18–20. Nevertheless, the Martin Act does not explicitly include NCDs within the definition of a security, so the Court must turn to the *Howey* test to determine whether these transactions come under the "other securities" catchall. In *Marine Bank*, the Supreme Court held that conventional certificates of deposit issued by federally regulated banks were not securities for purposes of federal securities laws. *See Marine Bank v. Weaver*, 455 U.S. 551, 102 S.Ct. 1220, 71 L.Ed.2d 409, (1982). But *Marine Bank* does not foreclose a finding of a security if the underlying CDs lack a risk reducing factor, such as protection under federal banking regulations. *See id.* at 559, 102 S.Ct. 1220 ("It is unnecessary to subject issuers of bank certificates of deposit to liability under the antifraud provisions of the federal securities laws since the holders of bank certificates of deposit are abundantly protected under the federal banking laws. We therefore hold that the certificate of deposit purchased by the [plaintiff] is not a security."). Accordingly, courts have held that if certificates of deposit are not subject to existing governmental regulation, as with the NCDs involved here, these instruments may satisfy the *Howey* test and, thus, constitute a security for purposes of federal law. *See Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 756 F.2d 230, 240 (2d Cir.1985) ("In the present case, the certificates of deposit sold through the CD Program satisfy the *Howey* test for determining what constitutes an investment contract within the meaning of the Acts."); *Olson v. E.F. Hutton & Co.*, 957 F.2d 622, (8th Cir.1992) (holding that CDs may constitute securities under *Howey* where gaps exist in the protection afforded by banking regulations). *Gary Plastic* is illustrative. In that case, the Second

---

federal securities law, the Second Circuit has held that a common enterprise requires proof of "horizontal commonality," defined by "the tying of each individual investor's fortunes to the fortunes of the other investors by the pooling of assets, usually combined with the pro-rata distribution of profits." *Revak v.*

*SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994). The Second Circuit expressly rejected the notion that broad vertical commonality, the standard adopted for purposes of New York's Martin Act, satisfies *Howey*'s second element in the context of federal securities fraud. *See id.* at 88.

Circuit held that CDs issued and sold by a brokerage firm were securities in part because "absent the securities laws, plaintiff has no federal protection against fraud and misrepresentation by the defendants in the marketplace." *Gary Plastic,* 756 F.2d at 241. Because the NCDs in this case resemble the CDs involved in *Gary Plastic*—that is, the instruments were not subject to federal banking regulations, the investor risked loss of the investment, and the investor may have relied on the skill and advice of the investment firm—the Court finds that the NCDs satisfy *Howey* for purposes of the Martin Act and, therefore, constitute other securities under the statute.

■ Even though the NCDs involved securities under the Martin Act, the Court finds that the Act nonetheless does not bar the Defendants' negligence-based claims because the NCDs were not offered or sold "within or from" New York, as required by the statute. N.Y. Gen. Bus. Law § 352–c[1.]. Specifically, Lehman traders in London and Hong Kong negotiated the sale of these securities with Hu, who was situated in Beijing. Accordingly, the Martin Act does not preclude Defendants' claims for negligence, negligent misrepresentation and breach of fiduciary duty because the FX transactions and the interest-rate swaps did not involve securities, and the NCDs, although securities under the Act, were not sold within or from New York.

## B. Viability of Unsuitability Fraud and Markup Fraud Claims

The Court requested supplementary submissions regarding the Defendants' unsuitability fraud and markup fraud claims because of insufficient detail in the parties' summary judgment briefs.

### (1) Unsuitability Fraud

■ Apart from general fraud claims, the Defendants also allege common law fraud based on the doctrines of unsuitability fraud and markup fraud. As the Court observed in the Summary Judgment Opinion, these two categories of fraud are particular to the financial arena. Indeed, the suitability doctrine derives, in part, from a National Association of Securities Dealers rule that requires a member to consider suitability when recommending the purchase or sale of any security. *See Gabriel Capital, L.P. v. Natwest Finance, Inc.,* 137 F.Supp.2d 251, 262 (S.D.N.Y.2000) (quoting National Association of Securities Dealers Fair Practice Rules, Art. III, § 2 ("In recommending to a customer the purchase, sale or exchange of any security, a member shall have reasonable grounds for believing that the recommendation is suitable for [the] customer.")). The requisite elements for a suitability fraud claim also underscore the need for a financial context, requiring, as a threshold, the existence of a "security." *See* Op. at 82.[4] Moreover, in the Summary Judgment Opinion, the Court observed that, in pressing their suitability fraud claims under the common law, the Defendants failed to cite

---

**4.** To maintain a claim for unsuitability fraud, a party must establish five elements:
   (1) that the *securities* purchased were unsuited to the buyer's needs; (2) that the defendant knew or reasonably believed the securities were unsuited to the buyer's needs; (3) that the defendant recommended or purchased the unsuitable securities for the buyer anyway; (4) that, with scienter, the defendant made material misrepresentations (or, owing a duty to the buyer, failed to disclose material information) relating to the suitability of the securities; and (5) that the buyer justifiably relied to its detriment on the defendant's fraudulent conduct. *Brown v. E.F. Hutton Grp., Inc.,* 991 F.2d 1020, 1031 (2d Cir.1993) (emphasis added).

decisions other than ones involving 10(b) securities cases. *See id.* Accordingly, this Court determined that the viability of the Defendants' unsuitability claim hinges on the existence of a security because suitability fraud is a subset of a statutory 10(b) fraud claim and because the Defendants failed to cite any case under the common law where a party successfully maintained a suitability fraud claim. *See id.* (citing *Brown v. E.F. Hutton Grp., Inc.*, 991 F.2d 1020, 1031 (2d Cir.1993)).

Despite this determination, the Defendants still maintain that suitability fraud is independently actionable under the common law, advising that "[s]ince suitability fraud is merely an extension of common law fraud to the securities context, an action for suitability fraud exists under the common law with or without the presence of a security." Defs.' Supplemental Br. at 9. Notably, Defendants marshal no authority to support this assertion.

In further pressing the availability of a suitability claim, the Defendants rely on, for example, *Junius Construction Corp. v. Cohen*, 257 N.Y. 393, 178 N.E. 672, 674 (1931). But this case does little to convince the Court of the existence of a fraud claim under the common law based solely on suitability grounds. *Junius* exemplifies the well-established rule that fraud may result when a party who undertakes to mention facts regarding a transaction makes misleading statements of half-truths. *See id.* This axiom hardly supports the notion that Defendants posit, to wit, that a party to a transaction bears a duty to inquire as to the suitability of the deal for a counterparty. The Court therefore grants summary judgment with respect to the suitability aspects of the Defendants' common-law fraud claims.

**(2) Markup Fraud**

■ The Defendants allege that Lehman committed fraud by exacting excessive markups with respect to the NCDs and the swap transactions. Lehman moved for summary judgment on the markup fraud allegations, but in the Summary Judgment Opinion, the Court directed the parties to address this issue more fully in their supplemental submissions.

Section 10(b) gives rise to a private right of action for fraud where a broker charges a customer excessive markups without proper disclosure. *See Grandon v. Merrill Lynch & Co.*, 147 F.3d 184, 189–90 (2d Cir.1998) (finding an implied duty to disclose excessive markups on municipal bonds under § 10(b)). For purposes of this claim, "a markup is excessive when it bears no reasonable relation to the prevailing market price." *Id.* at 190 (quoting *Bank of Lexington & Trust Co. v. Vining–Sparks Sec. Inc.*, 959 F.2d 606, 613 (6th Cir.1992)). A court must evaluate the propriety of a markup on a case-by-case basis. *See id.*

Not only is markup fraud a subset of a § 10(b) claim, it is also based on the so-called "shingle theory" of liability. *See id.* at 192. The shingle theory imposes an implied duty on a securities dealer to disclose excessive markups based on the notion that the dealer creates this duty by "hanging out its professional shingle." *See id.* Put otherwise, "[u]nder the shingle theory, a broker-dealer who sells a security without disclosing that the price at which he is selling is not reasonably related to the current fair market price of the security violates the anti-fraud provisions of the federal securities laws—namely section 10(b) of the Securities Exchange Act of 1934, Rule 10b–5 promulgated thereunder, and section 17(a) of the Securities Act of 1933." *Granite Partners, L.P. v. Bear, Stearns & Co.*, 58 F.Supp.2d 228, 262 (S.D.N.Y.1999); *see also Bissell v. Merrill Lynch & Co.*, 937 F.Supp. 237, 246 n. 7

(S.D.N.Y.1996) ("[A] broker-dealer, by holding itself out as competent to conduct a brokerage business, owes its customer certain duties, including the duty not to sell securities at prices far in excess of market prices.").

In asserting markup fraud, the Defendants acknowledge that they do not "rely on the shingle theory to create a duty for Lehman to disclose their excessive and fraudulent markups." Defs.' Supplemental Br. at 16 n. 15. Rather, the Defendants argue that such a duty exists under New York common law, stating that "[t]he principle that the failure of a dealer to disclose excessive markups is fraudulent is recognized under the common law." *Id.* at 15. The court in *Granite Partners,* however, clearly held otherwise. In that case, the plaintiff, like the defendants here, argued that New York law recognizes a markup fraud claim under a general theory of fraud liability based on omissions. *See Granite Partners,* 58 F.Supp.2d at 263. The court rejected this assertion, finding that no New York authority explicitly supports the availability of a common law fraud claim based on the shingle theory, never mind a shingle theory claim for excessive markups. *See id.* Accordingly, the court refused to stretch the reach of a general fraud claim based on material omissions, explaining that: "Under the Federal securities laws, the representation of reasonable pricing is inferred. However, the shingle theory has not developed as a generic theory of fraud liability based upon omissions, but rather a specific theory of recovery under the federal securities laws." *Id.* at 264. Based on the reasoning in *Granite Partners,* among other things, the Court grants summary judgment in favor of Lehman with respect to the Defendants' markup fraud claims under the common law.

## C. Availability of § 10(b) Securities Fraud Claims

In the Summary Judgment Opinion, the Court reserved decision on Non–Ferrous' Thirteenth Counterclaim, which alleges that Lehman violated Section 10(b) and Rule 10b–5 by making material misrepresentations and by omitting material facts in connection with the interest-rate swaps and the NCDs.

To bring a claim under § 10(b) and Rule 10b–5, a plaintiff must demonstrate that: "(1) in connection with the purchase or sale of a security; (2) the defendant, acting with scienter; (3) made a material misrepresentation or (where there exists a duty to speak) a material omission, or used a fraudulent device." *Grandon,* 147 F.3d at 189. In terms of an omission, "the duty to disclose generally arises when one party has information that the other [party] is entitled to know because of a fiduciary or other similar relation of trust and confidence between them." *See id.* (internal quotation marks omitted). For purposes of a 10(b) claim, scienter "means intent to deceive, manipulate, or defraud, or at least knowing misconduct." *SEC v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1467 (2d Cir.1996) (internal citations omitted). Scienter is a fact-specific issue that is generally better left to the trier of fact to determine. *See SEC v. Hasho,* 784 F.Supp. 1059, 1107 (S.D.N.Y.1992).

As discussed above, interest-rate swaps are not securities in the context of a § 10(b) fraud claim and, furthermore, the Defendants state that they "do not argue that the swaps were securities." Defs.' Pretrial Mem. at 41. Therefore, the Court grants summary judgment with respect to Defendants' § 10(b) fraud claims that relate to the interest-rate swaps, including claims predicated on theories of suitability fraud and markup fraud.

In the case of the NCDs, the Court already determined that these instruments were securities under *Howey* for purposes of the Martin Act. And both sides agree that the NCDs involved securities under § 10(b). In addition, as with the Defendants' general fraud claims, the Court concludes that there are questions of fact precluding summary judgment with respect to the Defendants' § 10(b) fraud claims involving the NCDs, including those for unsuitability fraud and markup fraud. Specifically, the Defendants have identified conduct by Lehman that a trier of fact could find constitutes material misrepresentations or omissions. For instance, evidence indicating that Lehman misrepresented the swap transactions as safe investments to earn higher returns on the funds on deposit in Non–Ferrous' FX account, *see* Hu Aff. ¶¶ 76–78; that Lehman did not disclose that it was the underwriter for the NCDs, *see* Hu Aff. at 90; and that Lehman did not mark the NCDs to market on monthly account statements. *See* Miller Rep. at 10–11. In addition, as the Court determined in relation to the Defendants' general fraud claims, scienter can be inferred in this case based on, for example, an admission by a Lehman salesperson that Non–Ferrous "[was not] so sophisticated." *See* Op. at 81 (quoting Defendants' Ex. 120 at 199).

Proof of scienter also may be inferred for purposes of the Defendants' suitability fraud claim. *See Brown*, 991 F.2d at 1031 ("Scienter may be inferred by finding that the defendant knew or reasonably believed that the securities were unsuited to the investor's needs, misrepresented or failed to disclose the unsuitability of the securities, and proceeded to recommend or purchase the securities anyway."). This inference can be drawn from, for instance, the allegations that Lehman never disclosed the sizeable risks inherent in the NCD transactions, *see* Hu Aff. at 92–94, and that Lehman attempted "to fully explain [the] Thai Baht trades" only after Hu purchased the NCDs. Hu Aff. at 95–96. Furthermore, questions of fact exist regarding Defendants' claims of excessive markups on the NCDs, thereby precluding summary judgement. Specifically, the Defendants allege that their expert testimony establishes that Lehman's markups were excessive compared to market standards. While Lehman maintains that the markups were immaterial to Hu because the only relevant issue for an over-the-counter customer is the overall price of the transaction. *See* Pls.' Reply Mem. at 9. As such, the Court finds that factual issues exist regarding the markups on the NCDs, which thereby precludes summary judgment.

In sum, the Court grants summary judgment in favor of Lehman with respect to the § 10(b) claims relating to the interest-rate swaps, including those involving suitability fraud and markup fraud, because those transaction did not involve securities in the context of federal securities law. With respect to the FX transactions, the Court also grants summary judgment in Lehman's favor on the Defendants' suitability and markup fraud claims under the common law because such actions are not cognizable under New York law. To the extent the Defendants bring these claims pursuant to § 10(b), the Court also grants summary judgment in Lehman's favor because, as the Defendants themselves admit, the FX transactions did not involve securities. The Court denies Lehman's motion for summary judgment on the Defendants' § 10(b) claims arising out of the NCD transactions, including the suitability fraud and excessive markup claims, because of disputed factual issues.

### D. The Party "At Fault" Under the Guarantee Agreement

Defendant Non–Ferrous moves for summary judgment on Lehman's claim

that Defendant Minmetals breached an agreement to guarantee Non–Ferrous' FX obligations to Lehman (the "Guarantee"), arguing that the Guarantee is unenforceable because it is illegal under Chinese law. In the Summary Judgment Opinion, this Court held that Chinese law governs the Guarantee, which renders it illegal and unenforceable. The Court held that the Guarantee violated Chinese law because in order for a company like Minmetals to execute an agreement that guarantees the debts of foreign currency, it would have to obtain government approval. In addition, Chinese law requires that such a company register the approved guarantee agreement with the State Administration of Exchange Control in return for a Foreign Exchange Guarantee Registration Certificate. See deLisle Aff. ¶ 24. Putting aside the finger-pointing in this case, one thing is clear—Minmetals never abided by these regulations.

Even though the Guarantee is illegal, the Court determined that Chinese law provides a remedy for a party to an illegal contract if the invalidity was due to the fault of the other party to the agreement. And where both parties are at fault, neither party is entitled to a remedy. The Court then requested supplemental submissions on the issue of whether Minmetals, Lehman or both were at fault under Chinese law in relation to the Guarantee agreement.

The Court concludes that issues of fact preclude summary judgment on the determination of the party at fault with respect to the Guarantee.

In arguing that Lehman is entirely at fault in relation to the illegal Guarantee, the Defendants argue that Lehman was at fault for not requesting proof of Hu's authority, and besides which, there were numerous indications that Hu was not authorized. The Court, however, recently stated at a Pretrial conference in this case that the issue of Hu's authority to act on behalf of Minmetals involves an issue for trial, not for summary judgment. (Tr. at 3.)[5] Defendants, for example, cite an internal Lehman memo that refers to Hu as a Non–Ferrous employee as one indication. Defendants also point to the fact that Hu signed the Guarantee as a "General Manager" with no indication of what he was General Manager of as another indicator. But Lehman has produced evidence that Hu presented a business card to a Lehman salesperson bearing the name "China National Metals & Minerals Imp. & Exp. Corp." and identifying Hu as a General Manager, which may lead a trier of fact to conclude that, among other things, Minmetals may have cloaked Hu with authority. If Hu had authority to act on behalf of Minmetals, the trier of fact could conclude that Minmetals caused the illegality by not complying with Chinese regulations.

Other factual disputes exist regarding the question of fault with respect to the Guarantee. Lehman points to the fact that for six months Minmetals, not Hu, received monthly statements for the FX account as well as numerous confirmations of trading activity and never inquired about or objected to the FX trading. From this, Lehman argues that it was justified in believing that Minmetals was abiding by its own country's laws regarding FX trading and, therefore, Lehman was not at fault under the Guarantee. Defendants, on the other hand, claim that Minmetals knew nothing about the FX trading till Hu, the alleged rogue trader, confessed his wrongdoing in July of 1994.

---

5. Tr. refers to the Transcript of the pretrial conference held on November 27, 2001.

The question of fault is generally a fact-specific inquiry and, here, disputed issues of fact regarding the party at fault do exist. Accordingly, the Court denies Defendants' summary judgment motion on Count Three of the Amended Complaint.

### CONCLUSION

The Court holds that the Martin Act does not preempt the Defendants' Second, Third, Fourth and Sixth counterclaims, nor does it bar Defendants' Eighth affirmative defense. The Court grants summary judgment in favor of Lehman with respect to the suitability fraud and markup fraud aspects of Defendants' Fifth counterclaim and Fifth affirmative defense. The Court also grants in part and denies in part Lehman's motion for summary judgment on the Defendants' Thirteenth counterclaim. The Court denies the Defendants' summary judgment motion on Count Three of the Amended Complaint.

**SO ORDERED.**