**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**November 6, 2006**

**Charles R. Fulbruge III**
**Clerk**

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

)))))))))))))))))))))))))))

No. 06-50343
Summary Calendar

)))))))))))))))))))))))))))

K3C Inc., Sierra Industries, Inc.;

   Plaintiffs-Counter Defendants-Appellants,

 v.

Bank of America, N.A.

   Defendant-Counter Claimant-Appellee

 v.

Mark Huffstutler

   Counter Defendant-Appellant

---

Appeal from the United States District Court
for the Western District of Texas
(5:03-CV-557)

---

Before DeMOSS, STEWART and PRADO, Circuit Judges.

Per Curiam:[*]

 This dispute arose from a January 2000 interest rate swap

agreement between Defendant-Appellee Bank of America ("BOA")and

Plaintiffs-Appellants K3C Inc., Sierra Industries, Inc.,

---

 [*]Pursuant to 5TH CIRCUIT RULE 47.5, the Court has determined
that this opinion should not be published and is not precedent
except under the limited circumstances set forth in 5TH CIRCUIT
RULE 47.5.4.

1

("Companies"), and Mark Huffstutler ("Huffstutler"), the Companies' sole shareholder (collectively, "Appellants"). After losing money under the agreement throughout 2001 and 2002, the Companies brought suit against BOA seeking damages for (1) fraud, (2) gross negligence, (3) negligent misrepresentation, (4) breach of fiduciary duty, (5) breach of duty to disclose, (6) breach of duty to deal fairly and in good faith, (7) rescission due to misrepresentation, (8) violation of the Texas Deceptive Trade Practices Act, (9) violation of the Texas Business Opportunity Act, (10) violation of the Texas Securities Act, and (11) violation of the Bank Holding Company Act. Defendant BOA brought counterclaims for breach of contract against the Companies and against Huffstutler as Guarantor. Following a bench trial from August 12, 2004, until August 26, 2004, the district court denied all claims asserted by the Companies and held in BOA's favor on its contractual counterclaim. The court awarded BOA $186,641.67 plus interest for the termination payment found to be owed by the Companies under the agreement and an additional $225,000 in legal fees. The Companies and Huffstutler now appeal from this decision.[1] For the reasons that follow, we affirm the judgment of

---

[1] While Huffstutler is named as an appellant, all of the issues raised on appeal relate to the Companies' affirmative claims against BOA and BOA's contractual counterclaims against the Companies. At trial, Huffstutler made no affirmative claims against BOA, instead asserting only personal defenses to his personal liability as Guarantor. Huffstutler does not raise these personal defenses again in this appeal.

the district court.

## I. FACTUAL BACKGROUND

A.   The Parties and Their Relationship

The Companies, located in Uvalde, Texas, are engaged in the business of aircraft service, maintenance, and modification. As of December 31, 1999, the Companies had combined assets of approximately $19.1 million. The Companies had a more than twenty-year business relationship with BOA, having relied upon BOA for numerous loans and financing arrangements. At the time of the interest rate swap agreement at issue in this case, BOA's outstanding loans to the Companies equaled more than $7.7 million.

B.   Interest rate swaps

An interest rate swap is a transaction by which a borrower can hedge against the risk of interest rate fluctuations. The borrower and another party agree to exchange cash flows over a period of time. Most commonly, one party exchanges fixed rate payments for floating rate payments based on an underlying index such as LIBOR (London Inter Bank Offer Rate). This effectively converts the party's floating rate loan to a fixed rate loan. Thus, if the interest rate on a borrower's adjustable or floating rate loan rises, the increase in interest owed is offset by payments received through the interest rate swap.

The basic interest rate swap, known as a "plain vanilla"

3

swap, involves one party paying a fixed rate of interest, while the other party assumes a floating rate of interest based on the amount of the principal of the underlying debt, known as the "notional" amount of the swap. A "knockout" swap is an interest rate swap containing an additional feature--when the floating interest rate rises above a certain level, the obligation of the parties is knocked out, and no payment is required for that period. A knockout provision thus benefits the party making the floating rate payments, and this party correspondingly pays for the provision by offering a lower fixed rate to the other party.

C.    Prior Swap Agreements Between the Parties

On September 28, 1998, BOA representatives visited the Companies in Uvalde, Texas, and delivered a Powerpoint presentation marketing the use of swap agreements as hedges against rises in interest rates. The presentation, made to Huffstutler, then the Companies' President, and Chief Financial Officer Reggie Ewoldt ("Ewoldt"), provided a general overview of interest rate swaps as well as brief discussions of accounting, tax issues, and the method of terminating an interest rate swap.

On October 23, 1998, the Companies and BOA executed a customized ISDA form "Master Agreement" for swap transactions. ISDA is a trade body of swap dealers and other participants in the derivatives market. The ISDA form Master Agreements, widely used in the derivatives market at the time, provide a statement of conditions controlling all swap contracts between the parties

4

to the agreement. The Master Agreement executed by BOA and the Companies contained the terms that governed the succeeding swap transactions between them. In the event of early termination of a swap agreement, the Master Agreement provided that either BOA or the Companies would be required to pay a termination payment. The Master Agreement also included certain disclaimers and representations concerning the relationship of the parties and the non-reliance of each party upon each other's communications. The Companies did not seek or receive advice from independent advisors or other professionals concerning the Master Agreement or subsequent swap transactions.

On November 10, 1998, BOA and the Companies entered into the First Swap Transaction. This was memorialized on November 12, 1998, by the First Confirmation, which stated that the transaction would be governed by the terms of the Master Agreement. The transaction had a three-year term with a fixed rate of 5.33% and a $2 million notional amount. The termination date of the First Swap Transaction was November 13, 2001. Both BOA and the Companies fully performed under the First Swap Transaction.

While this agreement was in effect, Huffstutler and BOA executed a Guaranty. By the terms of the Guaranty, dated August 31, 1999, Huffstutler guaranteed to BOA the full and prompt payment when due of any and all liabilities, overdrafts, indebtedness and obligations of the Companies.

D.    The Knockout Swap Transaction

After the execution of the First Swap Transaction, BOA began to market to the Companies a new interest rate swap including a knockout provision. Conversations took place between Ewoldt and BOA representatives about the differences between plain vanilla and knockout swaps. On December 8, 1999, the Companies received a second Powerpoint presentation from BOA explaining certain attributes of the knockout swap. On January 31, 2000, BOA and the Companies entered into the Knockout Swap Transaction, memorialized by the Second Confirmation, in which the parties agreed that the transaction would be governed by the terms of the Master Agreement.

The Knockout Swap Transaction had a five-year term, a fixed interest rate of 6.5%, and a knockout provision if LIBOR exceeded 7.5%. Under the terms of the swap, therefore, if interest rates were between 6.5% and 7.25%, BOA made payments to the Companies. If interest rates rose above 7.25%, the swap would be knocked out for the period, and neither party would make payments under the agreement. If interest rates fell below 6.5%, however, the Companies would make payments to BOA. The notional amount of the swap was $2 million, and the effective date was February 1, 2000.

During 2000, both parties made payments under the Knockout Swap. In early 2001, however, interest rates began a steady fall, with the result that the Companies began to pay increasing

monthly amounts to BOA. Interest rates continued to drop throughout 2001 and fell below 2% in early 2002. Monthly payments by the Companies to BOA under the Knockout Swap were between $7000 and $9000 throughout 2002. The Companies' payments under the Knockout Swap totaled $179,901.12 by April 30, 2003.

In January 2003, the Companies requested that BOA provide them with a statement reflecting the amount necessary to pay off the Companies' underlying loans. BOA did so, and the Companies sold assets and used the proceeds to pay the amount due for outstanding loans from BOA. The Companies' payoff of the loans constituted a "Termination Event" under the Master Agreement, which allowed BOA to designate an "Early Termination Date." Under the provisions of the Master Agreement, upon termination the Companies were required to pay a termination fee equaling "the Non-defaulting Party's Loss in respect of this Agreement." In a letter to BOA dated June 2, 2003, the Companies refused to pay the termination fee and demanded that BOA return to the Companies the amount that the Companies had lost under the Knockout Swap. Subsequently, this suit was filed.

## II. ANALYSIS

On appeal, the Companies and Huffstutler raise eleven points of error. This court reviews the district court's findings of fact for clear error and conclusions of law de novo. Payne v. United States, 289 F.3d 377, 381 (5th Cir. 2002). For mixed

7

questions of law and fact, we review the district court's fact findings for clear error, and its legal conclusions and application of law to fact de novo. Id. In reviewing factual findings for clear error, we defer to the findings of the district court "unless we are left with a definite and firm conviction that a mistake has been committed." Id.

Federal jurisdiction in this case is based on the diversity of the parties. The parties are in agreement that the Companies' tort claims are governed by Texas law and both parties' contractual claims are governed by New York law.

A. Fiduciary Relationship

Appellants first argue that the district court erred in not finding a fiduciary relationship between BOA and the Companies and a breach of that relationship. Under Texas law,

> [t]here are two types of fiduciary relationships. The first is a formal fiduciary relationship, which arises as a matter of law, and includes the relationships between attorney and client, principal and agent, partners, and joint venturers. The second is an informal fiduciary relationship, which may arise from a moral social, domestic or purely personal relationship of trust and confidence, generally called a confidential relationship.

Swinehart v. Stubbeman, McRae, Sealy, Laughlin & Browder, Inc., 28 S.W.3d 865, 878-79 (Tex. App.--Houston [14th Dist.] 2001, pet. denied) (internal quotation marks and citations omitted).

The relationship between a borrower and lender is not one that gives rise to a formal fiduciary relationship. Whether there might be a confidential relationship between the Companies and

8

BOA is a more difficult question. However, the Texas courts "do not recognize such a relationship lightly." Exxon Corp. v. Breezevale Ltd., 82 S.W.3d 429, 443 (Tex. App.--Dallas 2002, pet. denied). BOA's longstanding business relationship with the Companies is not enough to establish a confidential relationship; Texas courts have held that "[t]he fact that a business relationship has been cordial and of extended duration is not by itself evidence of a confidential relationship." Swinehart, 28 S.W.3d at 880. Nor does the Companies' trust in BOA suffice, as "subjective trust is not enough to transform an arms-length transaction between debtor and creditor into a fiduciary relationship." Bank One, Texas, N.A. v. Stewart, 967 S.W.2d 419, 442 (Tex. App.--Houston [14th Dist.] 1998, pet. denied). Appellants have not shown that the district court erred in finding that no fiduciary relationship existed between the parties.

Moreover, the district court's conclusion is consistent with the parties' own depiction of their relationship in the Master Agreement. Part 5(h)(3) of the Master Agreement, incorporated by the Second Confirmation into the Knockout Swap Transaction, states as follows: "Status of the Parties. The other party is not acting as an agent, fiduciary or advisor for it in respect of that Transaction." The explicit language of the parties thus supports the district court's finding of no

9

fiduciary relationship between the Companies and BOA.

It remains possible that a so-called "special relationship" between the parties could exist under Texas law. A special relationship is an "extracontractual" relationship that "exists where there is an unequal bargaining position between parties to a contract." Bank One, 967 S.W.2d at 442. While a "fiduciary duty requires the fiduciary to place the interest of the other party before his own," the special relationship entails only the "common law duty of duty of good faith and fair dealing." Id. However, "[a] special relationship does not usually exist between a borrower and lender," id., and Texas courts have been reluctant to find a special relationship in that context. See, e.g., Farah v. Mafridge & Kormanik, P.C., 927 S.W.2d 663, 675-76 (Tex. App.–-Houston [1st Dist.] 1996, no writ). Where a special relationship between a borrower and lender has been found, it has rested on factors such as "excessive lender control over, or influence in, the borrower's business activities." Id. at 675. In this case, the district court found that there was no imbalance of power between the parties such that would give rise to a special relationship. After reviewing the record, we hold that the district court did not err in making this determination.

B.   Negligent Misrepresentation

Appellants argue that the district court erred in finding that the statute of limitations barred Appellants' claims for

10

negligent misrepresentation and gross negligence. Appellants further maintain that the district court erred in not finding sufficient evidence to support Appellants' claim for negligent misrepresentation. Appellants do not address argument to the district court's rejection of the merits of their gross negligence claim; this claim is therefore waived. Comty. Workers of Am. v. Ector County Hosp. Dist., 392 F.3d 733, 748 (5th Cir. 2004).

It is undisputed that the cause of action for negligent misrepresentation carries a two-year statute of limitations. TEX. CIV. PRAC. & REM. CODE ANN. § 16.003 (a) (Vernon 2005). The Companies' claim accrued for negligent misrepresentation on the date that the contract between BOA and the Companies was made. Tex. Am. Corp. v. Woodbridge Joint Venture, 809 S.W.2d 299, 303 (Tex. App.--Fort Worth 1991, writ denied). Thus, the Companies' claim accrued on January 31, 2000, the date of the Second Confirmation, and their suit was not filed until June 13, 2003, well outside of the two-year statute of limitations.

Appellants argue that the statute of limitations for their negligent misrepresentation claim should be tolled by the "discovery rule." The discovery rule provides that the statute of limitations will run "not from the date of the [defendant's] wrongful act or omission, but from the date that the nature of the injury was or should have been discovered by the plaintiff."

11

_Weaver v. Witt_, 561 S.W.2d 792, 793-94 (Tex. 1977). Texas courts will toll the statute of limitations if the injury is both inherently undiscoverable and objectively verifiable. _HECI Exploration Co. v. Neel_, 982 S.W.2d 881, 886 (Tex. 1998). An injury is inherently undiscoverable where it is "by nature unlikely to be discovered within the prescribed limitations period despite due diligence" by the plaintiff. _Ellert v. Lutz_, 930 S.W.2d 152, 156 (Tex. App.--Dallas 1996, no writ).

In the instant case, the district court found that the discovery rule did not apply because the nature of the injury was not inherently undiscoverable. Appellants have not demonstrated that the district court erred in this conclusion. There has been no showing that the Companies could not have obtained predictions about interest movements or outside advice regarding their legal and financial obligations under the Knockout Swap had they exercised due diligence. The district court correctly held that the statute of limitations bars Appellants' negligent misrepresentation claim.

Even if the discovery rule were applicable, Appellants could not have prevailed on the merits of their negligent misrepresentation claim. The elements of negligent misrepresentation are: (1) the representation is made by the defendant in the course of his business, or in a transaction in which he has a pecuniary interest; (2) the defendant supplies

"false information" for the guidance of others in their business;
(3) the defendant did not exercise reasonable care or competence
in obtaining or communicating the information; and (4) the
plaintiff suffers pecuniary loss by justifiably relying on the
representation. Fed. Land Bank Ass'n v. Sloane, 825 S.W.2d 439,
442 (Tex. 1991). In the instant case, the district court found
that "none of the information BOA provided to the companies can
be characterized as 'false information' sufficient to sustain a
negligent misrepresentation cause of action." On appeal, the
Companies have not identified any statements of fact by BOA that
were actually false. Nor have Appellants pointed to any
statements of fact by BOA that were so incomplete as to be
misleading. Nor, where BOA representatives made statements of
opinion, have Appellants shown that the BOA representatives did
not genuinely possess those opinions.

Moreover, had Appellants proved false statements by BOA,
Appellants could not have satisfied the justifiable reliance
prong of the negligent misrepresentation cause of action. In Part
5(h)(1) of the Master Agreement, incorporated by the Second
Confirmation into the Knockout Swap Transaction, each party
pledged that "[i]t is not relying on any communication (written
or oral) of the other party as investment advice or as a
recommendation to enter into that Transaction." Whether such a
disclaimer of reliance is binding is determined by the language

13

of the contract and the circumstances surrounding its formation. Schlumberger Tech. Corp. v. Swanson, 959 S.W.2d 171, 179 (Tex. 1997); see also Fair Isaac Corp. v. Tex. Mut. Ins. Co., No. H-05-3007, 2006 U.S. Dist. LEXIS 48426 at *6 (S.D. Tex. July 17, 2006).

In this case, the language of the disclaimer is clear and unambiguous, and the circumstances favor giving effect to the disclaimer. Though the Companies lacked the level of financial knowledge possessed by BOA, the district court found that "[t]he Companies routinely enter sophisticated transactions and use contracts in conducting their business" and that "[t]he Companies have entered contracts on numerous occasions that limit or disclaim warranties and remedies, clarify the status of the relationship between the parties, and ensure that agreements are limited to terms specified in written contracts." The Companies were capable of understanding the nature and effect of the disclaimer provisions in the Master Agreement. As a consequence, the Companies cannot claim to have justifiably relied on BOA's representations.

C.   Fraud

Appellants contend that the district court erred in not finding sufficient evidence to support the Companies' claim for fraud. To prevail on their fraud claim, the Companies must prove that: (1) BOA made a material representation that was false; (2)

14

BOA knew the representation was false or made it recklessly as a positive assertion without any knowledge of its truth; (3) BOA intended to induce the Companies to act upon the misrepresentation; and (4) the Companies actually and justifiably relied upon the representation and thereby suffered injury. Ernst & Young, L.L.P. v. Pac. Mut. Life, 51 S.W.3d 573, 577 (Tex. 2001).

For the same reasons that the Companies' claim for negligent misrepresentation lacks substantive merit, the Companies' fraud claim must too fail. The district court found that "BOA did not materially misrepresent characteristics of knockout swaps," and Appellants have not shown that this finding was in error. BOA may have communicated greater enthusiasm for the knockout swap than was warranted by the circumstances, but this conduct alone does not rise to the level of actionable misrepresentation. Moreover, even if the Companies proved that BOA made a false material representation, the Companies' reliance on that representation would not have been justifiable in light of the explicit disclaimer of reliance in the Master Agreement. (See supra, section II B.) We conclude that there was no error in the district court's rejection of the Companies' fraud claim.

D.   Deceptive Trade Practices Act (DTPA)[2]

---

[2] TEX. BUS. & COM. CODE ANN. § 17.50 (Vernon 2002 & Supp. 2006).

Appellants contend that the district court "erred in not applying the Deceptive Trade Practices Act and in not finding a violation thereof." The district court held that "the evidence does not support a finding of false, misleading, or deceptive acts sufficient to support [the Companies'] DTPA claim." The court found that "BOA's representations and disclosures concerning the Knockout Swap Transaction were not false, misleading, or deceptive." On appeal, the Companies argue that they qualify as "consumers" under the DTPA because the interest rate swap counts as a "service" within the meaning of the DTPA. Yet, while BOA maintained at trial that the Companies were not "consumers" under the DTPA, the district court did not reject the Companies' DTPA claims on this basis. Because Appellants have not addressed their argument to the district court's conclusion that BOA's representations did not violate the DTPA, the district court's holding must stand.

E.     Implied Duty of Good Faith and Fair Dealing/Duty to Disclose

Appellants argue that the district court erred in "failing to recognize Bank of America's 'Implied Duty of Good Faith and Fair Dealing' or its Duty to Disclose in regard to Appellants." Every contract governed by New York law contains an implied duty of good faith and fair dealing. N.Y. Univ. v. Cont'l Ins. Co., 87 N.Y.2d 308, 318 (N.Y. 1995); see also 1-10 Indus. Assocs., LLC v. Trim Corp. of Am., 297 A.D.2d 630, 631 (N.Y. App. Div. 2002).

16

This duty requires that "neither contracting party engage in conduct that will have the effect of destroying or injuring the rights of the other party to receive the benefit of the contract." Agency Dev., Inc. v. MedAmerica Ins. Co., 327 F. Supp. 2d 199, 203 (W.D.N.Y. 2004). The duty is breached when "one party to the contract affirmatively seeks to prevent the other party's performance or to withhold the benefits of the contract from the other party." Phlo Corp. v. Stevens, No. 00-3619, 2001 U.S. Dist LEXIS 7350, at *21-22 (S.D.N.Y. June 7, 2001).

As these New York cases indicate, the duty of good faith and fair dealing "relates only to the performance of obligations under an extant contract, and not to any pre-contract conduct." Indep. Order of Foresters v. Donaldson, Lufkin & Jenrette, Sec. Corp., 157 F.3d 933, 941 (2d Cir. 1998). See also Phoenix Racing, Ltd. v. Lebanon Valley Auto Racing Corp., 53 F. Supp. 2d 199, 216 (N.D.N.Y. 1999). Yet, in the portion of their appeal addressed to the duty of good faith and faith dealing, Appellants again rely on BOA's alleged misrepresentations prior to the signing of the Knockout Swap Agreement. Appellants do not point to any conduct by BOA in performance of the Knockout Swap Agreement that would violate BOA's duty of good faith and fair dealing. We therefore uphold the district court's determination that BOA did not breach its implied duty of good faith and fair dealing.

Under New York law, a duty to disclose during business negotiations may arise where there is a fiduciary or confidential

17

relationship between the parties, as well as where (1) one party has superior knowledge of certain information; (2) that information is not readily available to the other party; and (3) the first party knows that the second party is acting on the basis of mistaken knowledge. <u>Banque Arabe et Internationale D'Investissement v. Md. Nat. Bank</u>, 57 F.3d 146, 155 (2d Cir. 1995). The district court held that there was no fiduciary or confidential relationship between BOA and the Companies, and, as discussed <u>supra</u>, section II. A., we decline to overturn that conclusion. While BOA possessed greater knowledge of interest rate swaps than did the Companies, the Companies have not shown that they could not have readily obtained more information about prospective interest rate movements and about their legal and financial obligations under the Knockout Swap Agreement had they sought outside advice. We hold that BOA did not have an affirmative duty to disclose during contract negotiations with the Companies.

F.    Texas Securities Act

Appellants charge that the district court erred in concluding that the Texas Securities Act did not apply to the Knockout Swap Transaction. There are no cases that directly address whether interest rate swaps qualify as securities under the Texas Securities Act.[3] Looking to the federal securities laws for guidance, as did the district court in this case, is

---

[3]    TEX. REV. CIV. STAT. ART. 581-33 (Vernon 1964 & Supp. 2006).

therefore appropriate. See Beebe v. Compaq Computer Corp., 940 S.W.2d 304, 306-07 (Tex. App.--Houston [14th Dist.] 1997, no writ) ("While cases dealing with the federal securities laws are not dispositive concerning our interpretation of the Texas Securities Act, they may provide persuasive guidance."); see also In re Westcap Enters., 230 F.3d 717, 726 (5th Cir. 2000) ("[B]ecause the Texas Securities Act is so similar to the federal Securities Exchange Act, Texas courts look to the decisions of the federal courts to aid in the interpretation of the Texas Act.").

More than one federal court has held that interest rate swaps are not securities for the purposes of federal securities laws. See Proctor & Gamble Co. v. Bankers Trust Co., 925 F. Supp. 1270, 1277-83 (S.D. Ohio 1996); see also Lehman Bros. Commercial Co. v. Minmetals Int'l Non-Ferrous Metals Trading Co., 179 F. Supp. 2d 159, 164, 167 (S.D.N.Y. 2001). No court has held to the contrary. The case cited by Appellants, Caiola v. Citibank, N.A., 295 F.3d 312 (2d Cir. 2002), is not on point, for there the court addressed a very different type of financial instrument--a type of stock option known as a "cash-settled over-the-counter option." Caiola, 295 F.3d at 324-27. While the trial court in Caiola had relied on Proctor & Gamble, the Second Circuit concluded that Proctor & Gamble involved "a very different type of transaction." Id. at 326. We therefore uphold the district court's conclusion that the "non-securities based, interest rate

19

Knockout Swap at issue here is not a security under the Texas Securities Act."

G.   Bank Holding Company Act

Appellants argue that the district court erred in finding that BOA's actions did not violate the Bank Holding Company Act. The 1970 amendments to the Bank Holding Company Act, 12 U.S.C. § 1972, were directed at tying arrangements by banks that require bank customers to accept or provide some other service or product or to refrain from dealing with other parties in order to obtain the bank product or service they desire. Swerdloff v. Miami Nat'l Bank, 584 F.2d 54, 57-58 (5th Cir. 1978). To state a claim under § 1972, a plaintiff must show that (1) the banking practice in question was unusual in the banking industry, (2) an anti-competitive tying arrangement existed, and (3) the practice benefits the bank. Bieber v. State Bank of Terry, 928 F.2d 328, 330 (9th Cir. 1991).

The record supports the district court's conclusion that BOA committed no violation of the Bank Holding Company Act. Appellants point to no evidence that BOA conditioned the extension of credit or another service on the Companies' agreeing to an interest rate swap. The Companies' alleged inability to obtain an interest rate swap from another bank was not the result of anti-competitive or unusual business practices by BOA. Rather, it is the natural result of the Companies' decision to borrow substantial sums from BOA, requiring that a significant portion

20

of the Companies' assets be pledged as collateral.

## H.    Breach of Contract Counterclaim

Appellants argue that the district court erred in finding that the Companies breached their contract with BOA. Appellants first claim that their contract with BOA was unenforceable because of a lack of consideration, contending that "the Knockout Swap provided no benefit whatsoever to the Companies." Appellants argue that because the Companies' loans went into default, "BOA had a unilateral right to terminate the Knockout Swap from its inception," and as a result "there were no benefits to the Companies."

Under New York law, a promise unsupported by consideration is generally invalid. Granite Partners, L.P. v. Bear, Stearns & Co., 58 F. Supp. 2d 228, 252 (S.D.N.Y. 1999). Sufficient consideration may be provided either by a benefit to a promisor or a detriment to the promisee. Id. But even if a contract lacked consideration as written, performance by the parties can render the contract enforceable. "As a general rule, even a contract unenforceable at its inception because of lack of consideration or mutuality may nevertheless become valid and binding to the extent that it has been performed." Id. at 256 (internal quotation marks omitted); see also Flemington Nat'l Bank & Trust Co. v. Domler Leasing Corp., 65 A.D.2d 29, 36-37 (N.Y. App. Div. 1978) ("Even when the obligation of a unilateral promise is suspended for want of mutuality at its inception, still, upon

performance by the promisee a consideration arises which relates back to the making of the promise, and it becomes obligatory.") (internal quotation marks omitted); Pozament Corp. v. AES Westover, LLC, 27 A.D.3d 1000, 1001 (N.Y. App. Div. 2006).  In this case, it is undisputed that BOA performed under the Knockout Swap Transaction by making payments to the Companies for several months, and that the Companies accepted those payments. We hold that the district court did not err in rejecting the Companies' lack of consideration defense.

Appellants also claim that the Knockout Swap Transaction was unenforceable due to fraud by BOA. Under New York law, "a party induced to enter a contract by fraud or misrepresentations must make a choice; the party may either elect to accept the situation created by the fraud and seek to recover his damages or he may elect to repudiate the transaction and seek to be placed in the status quo." Ballow Brasted O'Brien & Rusin P.C. v. Logan, 435 F.3d 235, 238 (2d Cir. 2006) (internal quotation marks omitted). Here, the Companies have attempted to do both. Regardless, as discussed supra, section II. C., the district court concluded that there was no evidence of fraud by BOA, as BOA made no actionable misrepresentations. Appellants have not identified facts or law that would require us overturn the district court's conclusion, and therefore the Companies' fraud defense must fail.

I.   Attorney's fees

Appellants object to the district court's award of $225,000

22

in attorney's fees to BOA. A district court's award of attorney's fees is reviewed for an abuse of discretion, though factual determinations for the relevant factors are reviewed for clear error. Mathis v. Exxon Corp., 302 F.3d 448, 461-62 (5th Cir. 2002). Appellants first argue that BOA submitted insufficient evidence to allow the district court to "assess the legitimacy and reasonableness of BOA's requested fees." Appellants allege that BOA submitted as evidence only a two-page spreadsheet with a monthly breakdown of hours. This allegation is incorrect: On January 20, 2006, BOA filed a supplemental appendix of evidence containing copies of all its legal fee invoices for this matter. These submissions provided sufficient evidence for the district court to make its determination.

Appellants also argue that the amount awarded to BOA was unreasonable "in light of the amount involved and the results obtained." In diversity cases, state law governs both the award of and reasonableness of attorney's fees. Mathis, 302 F.3d at 461. In this case, this district court found that the BOA was entitled to attorney's fees for both its counterclaim and its defenses due to provisions in the contract between the Companies and BOA. Appellants do not challenge this conclusion. Accordingly, we look to New York law, which governs the Knockout Swap Transaction, to assess the reasonableness of the district court's attorney's fees award. New York cases provide that "the award of an attorney's fee, whether pursuant to agreement or

23

statute, must be reasonable and not excessive." <u>Rad Ventures Corp. v. Artukmak</u>, 818 N.Y.S.2d 527, 530 (2006). "Before ordering one party to pay another party's attorney's fees, the court always has the authority and responsibility to determine that the claim for fees is reasonable." <u>Solow Management Corp. v. Tanger</u>, 797 N.Y.S.2d 456, 457 (2005). In determining reasonableness, the following factors should be considered: "the difficulty of the questions involved; the skill required to handle the problem; the time and labor required; the lawyer's experience, ability and reputation; the customary fee charged by the bar for other services; and the amount involved." <u>In re: Ury</u>, 485 N.Y.S.2d 329, 330 (1985).[4]

Appellants argue that the $225,000 award to BOA was excessive because BOA recovered only $186,641.67 in this litigation. But BOA also had to defend against numerous claims by the Companies, including a request for punitive damages. Moreover, the amount recovered in the lawsuit is only one of numerous factors to be assessed in determining attorney's fees; the time and labor required is another significant factor. <u>See id.</u> BOA produced evidence that its lawyers spent approximately 1,544 hours in connection with this litigation. Appellants have not shown that the amount of time or hourly rates were

---

[4] Both parties rely on Texas law in their arguments about attorney fee reasonableness and cite the eight-factor test from <u>Arthur Andersen & Co. v. Perry Equip. Corp.</u>, 945 S.W.2d 812, 818 (Tex. 1997). The <u>Andersen</u> factors are the very similar to the factors cited above in <u>In re: Ury</u>; thus the same result would be reached under Texas law.

unreasonable for the issues involved. We hold that the district court did not abuse its discretion in making the attorney's fees award that it did.

### III. CONCLUSION

For the reasons above, we AFFIRM the district court's judgment in this matter on all claims, counterclaims, and awards.

AFFIRMED